ESTATE OF SIDNEY B. BETTE, DECEASED, GLADYS BETTE, EXECUTRIX and GLADYS BETTE, SURVIVING WIFE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Bette v. Commissioner
Docket No. 4554-74.
United States Tax Court
T.C. Memo 1977-404; 1977 Tax Ct. Memo LEXIS 37; 36 T.C.M. (CCH) 1636; T.C.M. (RIA) 770404; November 22, 1977, Filed Benjamin D. Fein,David P. Land, and Eugene L. Vogel, for the petitioners. Joan Ronder Domike, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in petitioners' Federal income tax in the amount of $34,004.50 for the taxable year ending December 31, 1965. The issues for decision are: (1) whether payments made by a subchapter S corporation to Bette should be treated as a dividend or as a redemption of the corporation's stock; and (2) whether that portion of the amount distributed and placed in escrow is taxable in 1965. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Sideny B. Bette (hereinafter referred to as Bette) and Gladys Bette, husband and wife, filed a joint income tax return for the taxable year 1965 with the *39 district director of internal revenue, New York, New York. Bette died on February 29, 1968. His successor in interest, the Estate of Sidney B. Bette, Deceased, is a New York estate, of which Gladys Bette is executrix. The petitioners' legal residence was in New York, New York, at the time of the filing of the petition herein. Budd Contracting Corporation (hereinafter the corporation) kept its books and filed its Federal income tax returns on a calendar year basis using the accrual method of accounting. Bette and Henry H. Renard (hereinafter Renard) each owned onehalf of the issued and outstanding shares of the corporation's common stock until September 2, 1965. On January 11, 1962, the corporation duly elected to be taxed as a small business corporation under subchapter S. [1] That status continued through December 31, 1965.
On April 4, 1962, Renard, Bette, and the corporation entered into a written agreement (the 1962 agreement), which provided, inter alia, for the purchase of the shares of a stockholder upon *40 his death or disability. The agreement provided in relevant part as follows: AGREEMENT, made the 4th day of April, 1962, between HENRY H. RENARD and SIDNEY B. BETTE, hereinafter separately referred to as "Stockholder" and together referred to as "Stockholders", and by them with BUDD CONTRACTING CORPORATION, hereinafter referred to as "Corporation", WHEREAS, the Stockholders are the owners of all the outstanding capital stock of the Corporation, and WHEREAS, the parties believe that it is in the best interests of the Corporation and the Stockholders to make provision for the future disposition of the shares of capital stock of the Corporation, IT IS, THEREFORE, AGREED, in consideration of the premises and the promises herein contained, as follows: * * *
2. Purchase upon death. Upon the death of a Stockholder (hereinafter referred to as the "decedent"), all of the shares of the capital stock of the Corporation owned by him and to which he or his personal representatives shall be entitled, shall be sold and purchased, as herein provided. (a) Obligation of Corporation to purchase.The Corporation shall purchase from the decedent's personal representatives and *41 the decedent's personal representatives shall sell to the Corporation all of the shares of capital stock of the Corporation owned by the decedent and to which the decedent or his personal representative shall be entitled, at the price and on the terms set forth in paragraph "4" hereof. * * *
(c) Insufficiency of corporate surplus.
* * *
If the Corporation shall * * * be unable or refuse to purchase all of the decedent's shares of capital stock, the obligation of the Corporation with respect to the shares which the Corporation shall be unable or refuse to purchase shall be deemed assumed by the surviving Stockholder. 3. Purchase upon disability. (a) If either Stockholder shall, during the period of his employment by the Corporation hereunder, become permanently disabled (by physical or mental illness, or by a combination thereof) to the extent that he shall be, and continue to remain, unable substantially to perform the duties theretofore performed by him as officer and employee of the Corporation and to participate actively in its affairs, then the shares of capital stock of the Corporation owned by him shall be purchased and sold in the same manner as if *42 such Stockholder had died except that the closing of such purchase shall take place six (6) months after the determination of such disability, as provided below, and all payments due to said disabled party, so long as he survives, shall be made to him. * * *
4. Purchase price. (a) The purchase price of the shares of capital stock of a Stockholder hereunder shall be: (1) Their book value as of the date of offer, disability or death, as the case may be, as determined by the accountant or accounting firm then servicing the Corporation. Such determination shall be made in advance [sic] with sound accounting practice except that no allowance of any kind shall be made for good will, trade name or any similar intangible asset; (2) Ten percent (10%) of the net profits of the business, if any, in each of the three (3) succeeding calendar years commencing with the year in which the closing date of sale occurs (unless such closing shall be after June 1, in which event said three (3) years shall commence on the following January 1), which payments shall be deemed to be made for the good will of the Corporation attributable to said shares of stock. Such determination shall be *43 made in accordance with sound accounting practice and shall include Federal, State and local income and franchise taxes upon the Corporation among the deductions in arriving at said net profit. Bette suffered a stroke in October, 1964.He remained in the hospital for a period of four and one-half months. Throughout this period, Bette remained in the employ of the corporation and continued to receive his salary. In addition, the corporation issued checks totaling $10,000 each to Bette and Renard on March 15, 1965. Shortly after he left the hospital, Bette attempted to return to the business. However, it soon appeared that this would not work out and, after a short period of time, Renard offered to purchase Bette's stock in the corporation. Bette rejected this offer because he thought that the proposed purchase price was insufficient. Subsequently, Bette secured the services of an attorney, Samuel S. Sherwood, and an accountant, Hy Manton, to assist him in disposing of his stock. Manton and Alexander Gassman, the accountant for the corporation, examined the books of the corporation and determined that one half of the book value of the corporation as of April 30, 1965, was $122,025.45. *44 Manton and Sherwood discussed the proposed sale to Renard or redemption of the stock by the corporation with Bette, and both advised Bette that, under either alternative, the proposed transaction would be treated as the sale of a capital asset. Bette agreed to transfer his shares for $122,025.46 on the basis of this advice, namely, that any gain from the sale would be long-term capital gain. On August 12, 1965, a meeting was held at the offices of the corporation's attorney, Julian S. Bush, to work out the final arrangements for the sale of Bette's stock. At that meeting (attended by Sherwood, Manton, Bush, and Gassman), Bush asked whether anyone representing Bette objected to having the corporation, rather than Renard, purchase the stock. Also discussed at this meeting was the question of whether a portion of the purchase price should be placed in escrow as a reserve for potential New York City and New York State tax liabilities of the corporation for prior years and for possible liability arising out of a lawsuit brought against the corporation. A question was raised as to whether a reserve for Federal corporate tax liabilities for the then unaudited years 1962-1964 and for *45 1965 should also be established. Both accountants indicated that no such reserve was needed because the corporation was a subchapter S corporation. There was no discussion at this meeting that Bette would be obligated to pay taxes on one half of the profits for the January 1 - April 30, 1965, period. An agreement, dated August 30, 1965, was executed by Bette, Renard, and the corporation and provided in relevant part: WHEREAS, the Stockholder [Bette], the Corporation and Henry H. Renard entered into an agreement dated April 4, 1962, and WHEREAS, paragraph 3 of such agreement provides for the purchase and sale of a disabled stockholder's shares of stock in the corporation, and WHEREAS, it has been determined that the Stockholder became permanently disabled on April 30, 1965 as defined in paragraph 3 of such agreement, and WHEREAS, Alexander Gassman, the accountant for the Corporation has determined the book value of the shares of stock of the Stockholder in the sum of One hundred twenty-two Thousand twenty-five and 46/100 ($122,025.46) Dollars in accordance with the audit prepared by him as of the 30th day of April, 1965, which audit has been approved by Hy Manton, accountant *46 for the Stockholder, and Whereas, there is certain litigation pending by Benzinger's 51st Street, Inc. against the Corporation and there are certain contingent liabilities against the Corporation for gross receipt taxes and franchise taxes, IT IS THEREFORE AGREED, in consideration of the premises and the promises herein contained, as follows: 1. The Stockholder, pursuant to the agreement of April 4, 1962, will sell his stock to the Corporation and the Corporation will purchase the same. 2. The purchase price to be paid by the Corporation to the Stockholder, pursuant to said agreement, is the sum of $122,025.46, together with certain contingent annual payments for good will, set forth below, payment to be made as follows: (a) $93,826.96 upon the signing of this agreement by a good check of the Corporation payable to the order of the Stockholder. (b) $28,198.50 upon the signing of this agreement by a good check of the Corporation payable to the order of the Stockholder, which check shall be endorsed over by him to the order of the Escrowees. (c) Contingent annual payments to be paid by the Corporation to the Stockholder by good check for a period of three years commencing *47 with the 1st day of May, 1965 * * * * * *
3. The Corporation shall on the signing of this agreement deposit with the Escrowees the sum of $28,198.50. 4. The Escrowees shall deposit the funds received by them pursuant to the provisions of paragraph 2 (b) and paragraph 3 hereof in interest bearing savings accounts, in their names as escrowees. The said funds shall be retained by them to be disbursed for the following purposes: (a) $25,000,00 in payment of any final judgment recovered against the Corporation in the Benziger suit and to reimburse the Corporation for attorney's fees and expenses incurred in the defense of said suit. (b) $2,000.00 for additional New York State Franchise Taxes assessed for years prior to 1965. (c) $29,397.00 for additional New York City Gross Receipts taxes assessed for years prior to 1965. * * *
6.The Stockholder shall deliver to the Corporation simultaneously upon receipt of the payments provided for in paragraph 2(a) and (b), the following: (a) His written resignation as president and director of the Corporation. (b) The written resignation of Gladys Bette as an officer and director of the Corporation. (c) His stock *48 certificate representing 5 shares of the capital stock of the Corporation endorsed by the Stockholder. 7. Immediately after the closing the Corporation will deliver to the Stockholder a certificate of stock for 5 shares of the capital stock of the Corporation with blank stock powers endorsed and attached by delivering the same to Samuel S. Sherwood, to be held by him in escrow for the Stockholder as collateral security until all payments called for in this agreement have been paid in full to the Stockholder at which time such certificate shall be returned forthwith to the Corporation. * * * 8. This agreement is made pursuant to the provisions contained in the agreement of April 4, 1962, hereinbefore mentioned, which agreement is incorporated herein as though set forth at length. The closing of the 1965 agreement took place at a meeting at which Renard, Bush, Sherwood, Gassman, and Manton were present. At no time did Bette or either of his representatives, Manton or Sherwood, express among themselves or to Renard or either of his representatives, Bush and Gassman, that the portion of purchase price representing one half of the corporation's profits would be taxed to Bette *49 as ordinary income by virtue of the subchapter S election. Pursuant to Paragraph 2 of the 1965 agreement, the Corporation issued two checks to Bette totaling $122,025.46. One, in the amount of $28,198.50, was forthwith endorsed by Bette in favor of Bush and Sherwood as escrow agents. Distributions from the escrow funds to or for the benefit of Bette were not made until 1966 and 1970. In their 1965 Federal income tax return, petitioners reported $93,826.96 as proceeds from the sale of the stock and reported a capital gain thereon in the amount of $84,169.97. Respondent determined in the notice of deficiency that $97,968.98 (representing one-half of the undistributed taxable income of the corporation for the period January 1, 1965 through April 30, 1965) was a dividend from the corporation and that $4,399.49 constituted long-term capital gain. OPINION In September, 1965, Bette received $122,025.46 from the corporation. The issues before us are (1) whether any portion of this sum constituted a dividend from the corporation, and the amount thereof, and (2) whether that portion of the amount received and forthwith placed in escrow is taxable, either as a dividend or capital *50 gain, to Bette in 1965. If, in fact, the transaction involved herein was solely a redemption of Bette's stock by the corporation, the redemption proceeds would be treated as a distribution in full payment in exchange for the stock. Section 1.1372-1(c)(3), Income Tax Regs.; section 302(a). Since the stock in question clearly is a capital asset held for more than six months, gain from the redemption would be taxable as a long-term capital gain. Petitioners argue that, under the terms of the 1965 agreement, the corporation redeemed Bette's shares, and for tax purposes the transaction should be treated as a redemption. Respondent urges us to look behind the plain language of the written undertakings of the parties and find that they intended that Bette should be taxable, by virtue of the corporation's subchapter S status, on one-half of the undistributed taxable income of the corporation for the period January 1, 1965, through April 30, 1965. In this context, the parties have argued extensively as to the proper scope of the parol evidence rule -- a rule which is not without its difficulties in application and one which we have recently articulated as *51 not precluding "our continued liberal admission of extrinsic evidence * * * in order that we [may] base our decisions on the substance of the documents before us rather than their form." See Estate of Craft v. Commissioner,68 T.C. 249, 263 (1977). We find it unnecessary to resolve this conflict between the parties because, taking the view of the parol evidence rule most favorable to respondent's position, we think petitioners should prevail on the basis of the record before us in this case (including our evaluation of the testimony of the witnesses whom we saw and heard). The 1965 agreement provided that Bette "will sell his stock to the Corporation and the Corporation will purchase the same" and that "The purchase price to be paid by the Corporation to [Bette] * * * is the sum of $122,025.46." This language, together with many other provisions of that agreement, as well as of the 1962 agreement, which the 1965 agreement was intended to implement, makes it clear that what was contemplated was a purchase and sale of Bette's stock. Two significant matters were discussed at the August 12, 1965, meeting. First, the parties discussed the establishment of reserves *52 for potential liabilities of the corporation.It was agreed that reserves should be established for tax liabilities possibly owing to New York City and New York State and for possible civil liability arising out of a lawsuit brought against the corporation. When the question of establishing a reserve for Federal corporate tax liability was raised, Manton stated that there was no need for a corporate reserve because the corporation had elected subchapter S status.
Respondent seeks to draw from this discussion of reserves for Federal tax liability an agreement that Renard and Bette would each be responsible for the taxes on one-half of the corporation's undistributed taxable income for the January - April 30, 1965 period. The statements concerning the Federal tax liability were made in the context of establishing reserves for corporate liabilities. All that was communicated was that the corporation had no need to establish a reserve because the corporation was not required to pay Federal income taxes. The second matter discussed at the August 12, 1965, meeting was the substitution of the corporation for Renard as the purchaser of Bette's interest. Prior to the meeting, negotiations *53 focused on the amount Bette would receive for his stock, and all parties assumed that Renard would purchase Bette's shares. If Renard had done so directly, no portion of the purchase price would be viewed as a dividend paid to Bette by the corporation. Bette's representatives at the meeting, Sherwood and Manton, indicated that they had no objection to the change of purchaser. As they viewed the situation, the proceeds would be taxable to Bette as a capital gain whether the transaction was structured as a redemption by the corporation or as a sale to Renard. Sherwood and Manton had discussed the tax aspects of the situation with Bette, and it was on the understanding that his gain would be taxed as long-term capital gain that Bette agreed to sell his shares either to Renard or to the corporation. We note that Renard testified herein that, prior to signing the agreement dated August 30, 1965, he inquired as to the absence of a provision requiring Bette to pay the tax due on his share of the earnings and that Bush recalled that inquiries of such a nature had been made. However, Manton testified that there was no discussion among the parties as to whether Bette would report as *54 income one-half of the corporation's earnings for the first four months of 1965. As far as we can discern from the record, any discussion as to individual tax liability for the corporation's profits in 1965 was related in the minds of Manton and Sherwood to the discussion of the necessary corporate reserves for taxes. Such being the case and in light of the fact that Renard was represented by counsel and an accountant, we are not prepared to say, as respondent would have us do, that the agreement was contrary to Renard's understanding and that Bette's representatives knew that Renard misunderstood the terms of the agreement, assuming without deciding that any such knowledge would be a significant consideration in determining the issue involved herein. Based upon the foregoing, we conclude that neither Bette nor any of his representatives ever agreed that a portion of the purchase price would be taxable to him as ordinary income. Renard may well have had a contrary (and mistaken) intent or understanding, but such a unilateral mistake or intention does not justify a refusal to follow the unambiguous terms of the 1965 agreement. See 13 Williston on Contracts, secs. 1549, 1580 *55 (3d ed., Jaeger). We hold that Bette properly reported the proceeds as gain from the sale of the capital asset. We are aware of the fact that our rationale points to a companion conclusion that Renard, as the sole shareholder of the corporation on December 31, 1965, would be required to include in his gross income the entire undistributed taxable income of the corporation for 1965 and that this conclusion is at odds with our decision in Renard v. Commissioner,T.C. Memo. 1972-244. However, at the trial of this case, we had the opportunity to hear the testimony of three witnesses, Sherwood, Manton, and Mrs. Bette, concerning the events leading up to the 1965 agreement. These witnesses did not testify as to these matters in Renard v. Commissioner,supra, and their testimony herein imparts a much different flavor to the events than was available at the earlier trial. All three witnesses were available to testify at that trial, and, in fact, Manton was called by the petitioner, Renard, as a hostile witness. Respondent chose not to call any of the three or to cross-examine Manton on that occasion. The long and the short of the matter is that *56 different triers of the fact can reach different conclusions on the basis of different records, albeit dealing with the same ultimate issue. Cf. Ginsburg v. United States,184 Ct. Cl. 444, 396 F. 2d 983 (1968). Indeed, we recognized this principle in Renard v. Commissioner,supra, wherein we distinguished Erickson v. Commissioner,56 T.C. 1112 (1971). As we said of Erickson in Renard, so do we say of Renard herein, "We are dealing therefore with a different [basis for] factual determination with respect to the parties' ultimate desires and intentions." See also Grant, Subchapter S Taxation, sec. 33.5 (1974).Finally, we are constrained to note that it was within respondent's power to prevent the double loss which our decision herein imposes on him, not only by providing this Court with a more extensive record in Renard v. Commissioner,supra, but also by issuing a deficiency notice to Bette and, after the filing of a petition by Bette, moving to consolidate the two cases. See Rule 141 of the Rules *57 of Practice and Procedure of this Court. Compare Coven v. Commissioner,66 T.C. 295, 308, n. 11 (1976); Cooney v. Commissioner,65 T.C. 101 (1975). Nor are we impressed with respondent's argument that his position is consistent with the basic treatment of subchapter S corporations. He argues that if Bette had remained a shareholder through December 31, 1965, or if the corporation had closed its taxable year on April 30, 1965, Bette would have been taxed on one-half of the profits through April 30. He concludes that it is anomolous to allow Bette to escape taxation at ordinary income rates by selling his interest at mid-year. On a record which is ambiguous, this argument may well be an appropriate aid in reaching the requisite ultimate factual determination. See Renard v. Commissioner,supra.But where such ambiguity does not exist, the short answer to this argument is that the statute clearly permits a shareholder of a subchapter S corporation to sell his shares without including in his gross income his pro-rata share of the corporation's *58 taxable income for the portion of the year he owned the stock. If Congress desired to tax shareholders on such amounts, it easily could have done so. See section 706(c). Compare Foxman v. Commissioner,41 T.C. 535 (1964), affd. 352 F. 2d 466 (3d Cir. 1965). [2]
We now turn to the question of how much of the proceeds from the sale of his stock is taxable income to Bette in 1965. Bette received checks in the amounts of $28,198.50 and $93,826.96. As required by the 1965 agreement, he forthwith endorsed the $28,198.50 check to the order of the escrow agents. The escrowed funds were to be used to pay the contingent liabilities specified in the agreement.
Gain generally is included in gross income for the taxable year in which it is actually or constructively received. Hall v. Commissioner,15 T.C. 195, 199 (1950), affd. per curiam 194 F. 2d 538 (9th Cir. 1952); section 1.451-1(a), Income Tax Regs. *59 Where a portion of the sale proceeds is placed in escrow, and there is a real possibility that the seller will never receive the funds, such amounts are not income to the seller until restrictions on the seller's use are removed. Commissioner v. Brooklyn Union Gas Co.,62 F. 2d 505 (2d Cir. 1933); 2 Mertens, Law of Federal Income Taxation, sec. 12.105, p. 455 (1974 rev.). The fact that Bette received the entire contract price from the corporation and then forthwith placed a portion thereof into the escrow account (as was required by the contract of sale) does not require a contrary result. McArdle v. Commissioner,11 T.C. 961 (1948); cf. Johnston v. Commissioner,14 T.C. 560 (1950); see Hall v. Commissioner,supra at 200. [3]
At no time in 1965 did Bette have sufficient dominion and control over the $28,198.50 to require that it be taxable to him in 1965. In that year, he had no right to cash the check and use the proceeds, and there was *60 a significant risk that the escrow would be used to pay off corporate liabilities, with the result that none of such proceeds would ever be paid to him. Compare Aldridge v. Commissioner,51 T.C. 475 (1968). Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, unless otherwise indicated.↩
2. See also Boland v. Commissioner,T.C. Memo. 1972-233, affd. without published opinion 506 F. 2d 1050↩ (1974).
3. See also International Trading Co. v. Commissioner,T.C. Memo. 1958-104, affd. on other grounds 275 F. 2d 578↩ (7th Cir. 1960).