ESTATE OF ROBERT E. CART-WRIGHT, Deceased, Dorothy G. Cartwright, Executrix, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 97–70032.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 18, 1998.

Decided July 12, 1999.

John M. Youngquist and Donald L. Feurzeig, Titchell, Maltzman, Mark, Bass, Ohleyer & Mishel, San Francisco, California, for the petitioners-appellants.

Randolf L. Hutter, United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

Before: T.G. NELSON, THOMAS, and SILVERMAN, Circuit Judges.

Opinion by Judge SILVERMAN;
Partial Concurrence and Partial Dissent
by Judge THOMAS.

SILVERMAN, Circuit Judge:

At the time of his death in 1988, Robert E. Cartwright was the majority shareholder of the law firm of Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc. ("CSB"). When he died, the firm received life insurance proceeds of over five million dollars, which it paid to his estate under the terms of a shareholders' agreement. In light of the language of the agreement, the tax court held that the proceeds constituted payment not only for Cartwright's share of CSB stock, but *also* for any claims he might have had, in the words of the agreement, to the firm's "cases or work in process." As the latter portion would be "income in respect of a decedent," the court determined that the estate owed a federal income tax deficiency of $1,105,762.

On appeal, Cartwright's estate contends that the court erred in holding that the proceeds redeemed anything other than Cartwright's stock in the firm. The estate also claims that the tax court failed to consider properly the effects of advanced client costs, work in process, and the life insurance proceeds in calculating the value of the stock. We remand to the tax court for a redetermination of the effects of advanced client costs and work in process on the stock value, but affirm the decision of the tax court in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1969 Cartwright and others incorporated CSB. Only CSB attorneys were shareholders. The firm distributed no dividends, but paid to each associate and shareholder a salary and distributed its profits as bonuses. CSB's shareholders determined the amounts of the yearly bonuses based on each attorney's contribution to the firm.

In a 1973 shareholders' agreement, CSB addressed what would happen to the interest of a shareholder upon his death. The agreement provided that CSB would purchase the deceased shareholder's interest in the firm and, in return, pay to the shareholder's surviving spouse or estate the following amounts: (1) the shareholder's actual purchase price for his CSB stock; (2) any earned but unpaid profits prior to death; (3) any earned but unpaid salary prior to death; (4) incurred but unreimbursed expenses or loans; (5) 25 percent of the net amount received after death for cases that the shareholder brought to CSB; (6) ten percent of the net amount received for cases pending at the date of death that came to the firm due to the firm name or the efforts of an associate; (7) 25 percent of the net amount received during the three years following the shareholder's death from cases for clients that the shareholder brought to the firm who provide continuing legal business; and (8) one-half of any life insurance

proceeds from policies on the shareholder's life, to be applied toward the previous obligations.

In 1988 CSB amended the shareholders' agreement only as it related to the disposition of Cartwright's interest in the firm upon his death. The amendment recited that CSB had purchased two life insurance policies on Cartwright's life totaling $5,000,000. Pursuant to the amendment, CSB, the beneficiary under the polices, would use the proceeds upon Cartwright's death exclusively to purchase his interest in the firm. The precise language of the 1988 amendment, which is crucial to our decision, is as follows:

> In the event of the death of Robert E. Cartwright, the proceeds of said policies payable to the Corporation *will be exclusively used to purchase and acquire from the estate and heirs of Robert E. Cartwright all of Mr. Cartwright's stock in the Corporation together with any claim to any cases or work in process that may otherwise be made on behalf of Robert E. Cartwright.* In this regard, the Corporation agrees to buy all of said stock and Robert E. Cartwright agrees to sell it. The value of said stock and claim in said cases and work in process is hereby fixed as the amount of proceeds of said life insurance policies. Any amounts owed to Mr. Cartwright for unpaid salary or expenses will be additionally paid or reimbursed to his Estate .... [emphasis added]

Cartwright died on June 30, 1988, the owner of 71.43 percent of the outstanding shares of CSB. As the shareholders had agreed, CSB paid the proceeds that it received from the two policies to Cartwright's estate. The total amount was $5,062,029, which included $62,029 in premium adjustments and interest. CSB issued a Form 1099–MISC, stating that it had paid $4,080,256 to the estate as non-employee compensation. The estate, however, did not report the proceeds it received from CSB as taxable income in its fiduciary income tax return. Instead, it took the position that the full amount of the proceeds were paid to redeem Cart-

wright's stock. The IRS disagreed, finding that $4,080,256 of the $5,062,029 was compensation and that the estate owed $1,142,472 for its tax deficiency.

Cartwright's estate appealed to the tax court. The court held that the plain language of the 1988 amendment made clear that CSB's payment of the insurance proceeds to Cartwright's estate was for both Cartwright's stock and for his claim to the firm's cases or work in process. It found that the amendment valued the total of these items at $5,000,000.

The tax court also concluded that neither CSB's work in process nor the insurance proceeds, which CSB paid directly to the estate, should have been considered an asset of CSB for purposes of valuing Cartwright's stock. Similarly, the court determined that the IRS's exclusion of advanced client costs in appraising CSB's assets was proper. Finding that the value of Cartwright's stock was $1,105,762, the court concluded that the other $3,956,267 of the payment to the estate was taxable as income in respect of a decedent.

## DISCUSSION

We review decisions of the United States Tax Court on the same basis as decisions of a district court in a civil bench trial. *Delk v. Commissioner of Internal Revenue,* 113 F.3d 984, 986 (9th Cir.1997). Thus, we review the tax court's interpretation of contract provisions de novo. *Confederated Tribes of Siletz Indians v. Oregon,* 143 F.3d 481, 484 (9th Cir.1998). We review its determination of the value of stock for clear error. *Trust Servs. of Am., Inc. v. United States,* 885 F.2d 561, 568 (9th Cir.1989).

I.

The first issue for decision is whether the payment to Cartwright's estate was made solely to redeem Cartwright's stock or whether it was for *both* Cartwright's stock *and* his claim to the firm's cases or work in process. The es-

tate contends that extrinsic evidence established an intent merely to buy out Cartwright's shares in the firm and that the 1988 amendment set the stock redemption value at $5,000,000. It argues that because the corporation, and not any individual shareholder, owns CSB's cases and work in process, Cartwright could have no interest in these items other than in his capacity as a shareholder. The tax court held that both the language of the amendment and the surrounding circumstances evidenced an intent to purchase more than Cartwright's shares.

We agree with the tax court. As the plain language of the 1988 amendment explicitly provides, CSB's distribution of the insurance proceeds to Cartwright's estate constituted payment for both "Mr. Cartwright's stock together with any claim to any cases or work in process." This unambiguous language reflects what Cartwright and his colleagues understood when drafting it-that Cartwright, at the time of his death, would have or might have an interest in the firm's "cases or work in process" that the firm agreed to buy out. The uncontradicted evidence of the firm's practices supports this conclusion as well. The primary component of Cartwright's compensation was not his salary. It was his bonus, paid at the end of each year based on his contribution to the firm. As the firm's majority shareholder, chairman of the board, and chief rainmaker, Cartwright, at the time of his death, had a reasonable expectation that he again would be voted a bonus for the cases that he had brought into the firm or had worked on himself.

The tax court correctly distinguished other cases in which payments made to a shareholder or his estate were held to redeem only the shareholder's stock. In *Smith v. Commissioner of Internal Revenue,* 82 T.C. 705, 1984 WL 15567 (1984), the evidence demonstrated an intent to enter into a stock purchase agreement and that the $25,000 payment was equivalent to the fair market value of the stock. Similarly, in *Steffen v. Commissioner of Internal Revenue,* 69 T.C. 1049, 1978 WL 3394 (1978), the language of a corporate redemption agreement conclusively established that the $40,000 paid to a shareholder was solely for his stock and was not compensation. In *Estate of Bette v. Commissioner of Internal Revenue,* 36 T.C.M. (CCH) 1636 (1977), the tax court relied on the clear terms of a stock redemption agreement. Finally, *Erickson v. Commissioner of Internal Revenue,* 56 T.C. 1112, 1971 WL 2470 (1971), also involved an unambiguous agreement providing only for the purchase of stock. In the instant case, both the clear language of the 1988 amendment and the underlying facts compel the conclusion that the parties intended that CSB buy out more than just Cartwright's shares of CSB stock. Any claims to work in process were included in the purchase price.[1]

## II.

Having determined that the insurance proceeds constituted payment for both Cartwright's stock and his claim to cases or work in process, we must now decide whether the tax court correctly apportioned the payment between these two

1. Judge Thomas makes an argument—not contained in the briefs—that the law firm's 1988 tax return somehow proves that Cartwright was compensated for his "cases or work in process" before he died and that therefore, by process of elimination, all of the insurance money paid to the estate is attributable to the purchase of the stock. We respectfully suggest that the tax return proves nothing of the sort. The return shows that in 1988, the firm deducted a total of $4,356,256 as compensation to Cartwright. As specifically reported in the return at an addendum to Schedule E, the firm attributed $4,080,256 of this amount to cases or work in process. This is the amount in controversy—the amount paid to the estate from the insurance proceeds and about which it issued a Form 1099–MISC to the estate. The remaining $276,000, reflected separately in a W–2 form, was nothing more than the salary that had been paid to Cartwright in 1988 before he died.

components. After hearing conflicting expert testimony from witnesses called by both parties, the court adopted the findings of the IRS's expert, who relied upon the 1973 agreement and its 1988 amendment in ascertaining the intent of the parties.

The estate argues that, even if the proceeds redeemed Cartwright's stock plus his claim to cases or work in process, the court made three errors in its valuation of his stock: (1) it failed to consider the effect of CSB's advanced client costs, (2) it ignored CSB's work in process on its contingent fee cases, and (3) it should have included the insurance proceeds as a nonoperating asset of CSB.

The estate is correct that the tax court should have included advanced client costs, which CSB maintained as a negative asset account, among the firm's assets, because they properly are treated as loans. *See Canelo v. Commissioner of Internal Revenue,* 447 F.2d 484, 485 (9th Cir.1971). The tax court also should have included the firm's work in process on contingent fee cases as an asset, since it would have influenced what a willing buyer would have paid for CSB stock. *See Estate of James E. Curry v. Commissioner of Internal Revenue,* 74 T.C. 540, 546–47, 1980 WL 4454 (1980).

■ The tax court did not err, however, by not including the life insurance proceeds as an asset of the firm for stock valuation purposes. It is true that in valuing stock, "consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent such nonoperating assets have not been taken into account in the determination of net worth, prospective earning power and dividend-earning capacity." 26 C.F.R. § 20.2031–2(f)(2). The court, however, properly determined that CSB's insurance policy would not necessarily affect what a willing buyer would pay for the firm's stock because it was offset dollar-for-dollar by CSB's obligation to pay out the entirety of the policy benefits to Cartwright's estate. *See Estate of John L. Huntsman v. Commissioner of Internal Revenue,* 66 T.C. 861, 875, 1976 WL 3635 (1976).

## CONCLUSION

The tax court correctly determined that CSB's payment of life insurance proceeds to Cartwright's estate redeemed both Cartwright's stock and his claim to the firm's cases or work in process. The unambiguous language of the 1988 amendment and an understanding of CSB's practices compel this conclusion. The court erred, however, in calculating what portion of the proceeds was for Cartwright's stock and what portion was for his claim to cases or work in process. We remand to the tax court for a redetermination of the value of the stock to take into account advanced client costs and work in process. We affirm in all other respects.

AFFIRMED IN PART AND REMANDED.

THOMAS, Circuit Judge, concurring in part and dissenting in part:

I agree with much of the majority opinion.[1] However, a close analysis of the record can only lead to one conclusion: the $5 million paid to Cartwright's estate was compensation solely for his stock in the law firm. Under the shareholders' agreement, the life insurance proceeds were to be paid to Cartwright's estate for the value of his stock and any claims he had to the firm's work in process. At the time of his death, Cartwright had no legal claim to the law firm's work in process apart from his shareholder interest. Thus, the entire amount should have been allocated to stock value. Because a million dollar tax was improperly imposed, I respectfully dissent.

---

**1.** I specifically concur in the holding that the tax court erred by excluding advanced client costs and work in process from corporate assets.

## I

Robert Cartwright founded the law firm and built it into a successful practice. At the time of his death, he was responsible for 90% of the firm's business. The 1973 shareholders' agreement provided that upon the death of a shareholder, his or her estate would receive, among other compensation, 25% of the net proceeds attributable to cases (s)he brought to the firm. The agreement further granted the deceased shareholder's estate a lien on each case from which the estate was entitled to be paid.

The undisputed evidence is that Cartwright became concerned about this provision as it applied to him. He wanted to make sure his wife was adequately compensated at his death, and he wanted to assure the firm's continuation. As Philip Borowsky, a fellow shareholder who was the assistant managing shareholder at the time of Cartwright's death, testified:

> [H]e pretty much dominated the firm. He had the majority vote. And we were concerned that he feel good about what was being done, and we wanted to—and we were very impressed with his concerns, that his position was that he brought in over 90 percent of the business and, in the event that he died, the firm could not survive if it was to pay 25 percent of the fees on those cases to his estate. And he didn't want us to be in ongoing discussions with his wife for years in the future as to what that amount would be.

To address these concerns, Michael Bezazian of Prudential Insurance Company was retained. He advised Cartwright and the firm that they should fairly value Cartwright's interest in the business and fund the payment of the interest through life insurance. He attended a portion of a firm meeting in 1988 where he was advised that the shareholders had agreed to a $5 million valuation for Cartwright's interest in the firm. At the meeting, the shareholders adopted an amendment to the 1973 shareholders' agreement that supplanted the agreement as it applied to Cartwright.

The 1988 amendment provided for the purchase of $5 million in life insurance and:

> In the event of the death of Robert E. Cartwright, the proceeds of said policies payable to the Corporation will be exclusively used to purchase and acquire from the estate and heirs of Robert E. Cartwright all of Mr. Cartwright's stock in the Corporation together with any claim to any cases or work in process that may otherwise be made on behalf of Robert E. Cartwright. In this regard, the Corporation agrees to buy all of said stock and Robert E. Cartwright agrees to sell it. The value of said stock and claim in said cases and work in process is hereby fixed as the amount of proceeds of said life insurance policies. Any amounts owed to Mr. Cartwright for unpaid salary or expenses will be additionally paid or reimbursed to his Estate.

The amendment only applied "as long as said life insurance policy continues to be in force." Otherwise, by the amendment's terms, "paragraphs 4. and 5. of the existing Shareholders Agreement will apply, unaffected by this amendment." Paragraphs 4 and 5 of the 1973 shareholders' agreement provided for compensation upon death based on a percentage of work in process attributable to the shareholder's efforts. Thus, the clear intent and effect of the Cartwright amendment was to fix the value of his interest in the business, to provide a means for purchasing it, and to extinguish any independent claim his estate might have upon his death in the firm's work in process. Indeed, Borowsky, who drafted the language along with Cartwright, testified:

> Q. . . . And did you have in your own mind . . . at the time this was signed [in] January '88 that Robert Cartwright had an interest in the corporate assets, other than as a shareholder, while he was living?
>
> A. As I said before, the purpose of acquiring the insurance policies was to satisfy any claims of—the main purpose

of it was to satisfy any claims his estate would have for cases he had brought into the firm.

Q. But his estate would only have claims based .upon the '73 shareholders' agreement. Isn't that correct?

A. That's right.

Q. And this was superseding it in the situation of his death, was it not? I mean, that's what —

A. That's right.

Q. Okay. So what claim could they have under this, except that they would—you know, let's say for some reason there's some defect and we still claim under the '73 agreement. Isn't—wasn't this a clause that made sure that there would be no claim under the '73 agreement?

A. Yes.

Q. Okay. And did I get an answer to my question of, did you have in your mind any understanding at the time you signed this agreement that Robert Cartwright had an interest, an independent interest in the cases that he brought in, you know, aside from his death? And he was not dead at that point, obviously. Did he have an independent interest in corporate assets? Easy question.

A. He had an interest as a shareholder.

Q. As a shareholder?

A. Yes.

Q. Okay. And was there any question in your mind—I think you've already articulated this, but now I think we're at the point of drafting the agreement and entering into the agreement. Was there any question in your mind that what it was going to alleviate with respect to the corporation was this future infinite claim of 25 percent, 10 percent, 25 percent in the various aspects of the business *ad infinitum* if he died? It was going to eliminate that problem that was created by the original agreement?

A. That's right.

In sum, the clear language of the 1988 amendment, as well as the uncontradicted testimony of the shareholder who drafted it with Cartwright, demonstrate that any right Cartwright had to work in process under the 1973 agreement was extinguished by the 1988 amendment.

The case of *Steffen v. Commissioner*, 69 T.C. 1049, 1978 WL 3394 (1978), is instructive. In that case, physician-shareholders of a professional service corporation executed a stock redemption agreement. *See Steffen*, 69 T.C. at 1050–51. After one of the physicians left the corporation, a dispute arose as to whether the payout made under the stock redemption agreement was for redemption of stock or for salary based on accounts receivable. *See id.* at 1052. The tax court rejected the corporation's argument that the payment included salary based on accounts receivable, noting that "as an employee Dr. Steffen had no legal interest in the accounts receivable." *Id.* at 1053. The court went on to explain:

The accounts receivable do not represent the services which the employees have rendered the Corporation, but, rather, the services that the Corporation, through its employees, has rendered to others. In other words, the accounts receivable are obligations owed to the Corporation, not obligations owed by the Corporation to its employees. This distinction may be blurred in a closely held professional service corporation because of the dual role of the employee-stockholders, but it must nevertheless be recognized.

*Id.* Like the corporation in *Steffen*, the law firm, not Cartwright individually, owned any amounts ultimately realized as a result of the work in process.

The results in *Steffen* are consistent with the real issue in this case: what was the "income in respect of the decedent" pursuant to 26 U.S.C. § 691? To be considered income in respect of the decedent, the decedent must have had a right to receive the income at the time of his or her death. *See Estate of Peterson v. Commissioner*, 667 F.2d 675, 679 (8th Cir.1981). As the court noted in that case:

Although it is pertinent to inquire whether the income received after death

was attributable to activities and economic efforts of the decedent in his lifetime, these activities and efforts must give rise to a right to that income. And the right is to be distinguished from the activity which creates the right. Absent such a right, no matter how great the activities or efforts, there would be no taxable income under § 691.

*Id.* (quoting *Trust Co. v. Ross,* 392 F.2d 694, 695 (5th Cir.1967) (per curiam)).

Although Cartwright's economic efforts contributed mightily to the firm's success, Cartwright had no right, apart from his shareholder interest, to the firm's work in process at the time of his death. The interest his estate would have had in a certain percentage of Cartwright's own work in process under the 1973 shareholders' agreement was extinguished by the 1988 amendment.

In interpreting the 1988 amendment, the tax court placed great weight on the phrase "together with any claim to any cases or work in process that may otherwise be made on behalf of Robert E. Cartwright," construing it to mean that Cartwright retained some residual rights in work in process under the 1973 agreement. However, the plain language of the phrase belies this interpretation. The amendment refers not to payment for "stock and work in process," but rather for stock and "claims to any cases or work in process *that may otherwise be made* " (emphasis added). In short, the phrase was merely confirming the intent of the parties to extinguish the claims to work in process that Cartwright's estate would have had under the 1973 agreement or would have been able to assert if the insurance policies had lapsed. Use of the phrase "that may otherwise be made" in any other context simply does not make sense.

Thus, this case is akin to *Smith v. Commissioner,* 82 T.C. 705, 708–09, 1984 WL 15567 (1984), in which a sale of stock agreement specified payments for stock and commissions. The court concluded that although the word "commissions" was used, the value should be attributed to stock alone because the shareholder had no right to commissions. *See Smith,* 82 T.C. at 717. Similarly, in this case, even though the 1988 amendments referred to both stock and work in process, Cartwright had no right to work in process at death independent of his shareholder interest. Thus, as in *Smith,* the payments made to his estate from the life insurance proceeds should be treated as compensation for stock alone.

Given that Cartwright had no independent, enforceable right to the law firm's work in process when he died, the tax court erred in allocating a portion of the $5 million payment to work in process. By undisputed testimony of the parties and in conformance with generally accepted accounting principles, the corporation alone owned the firm's work in process at the time of Cartwright's death. Thus, the tax court erred in treating the bulk of the payment to the estate as "income in respect of the decedent."

## II

Because the payment to Cartwright's estate was only for the purchase of stock, no appraisal of the stock was necessary-the parties already had agreed on its value. There is nothing wrong with this; shareholders are entitled to specify stock value for departing shareholders in advance by agreement so long as the value is determined by a bona fide, arm's length business arrangement that is not a device to transfer property to members of the decedent's family for less than fair market value. *See* 26 U.S.C. § 2703(b). That is precisely what was done in this case.

Although a new valuation should not have been conducted, the tax court undertook that task anyway. In doing so, it committed further error by improperly crediting an expert appraisal founded on how other shareholders had fared when compensated under the 1973 agreement. *Cf. Conkling v. Turner,* 18 F.3d 1285, 1303–04 (5th Cir.1994) (rejecting appraisal based on superceded prior agreement).

This error was compounded by the fact that payments made under the 1973 agreement to departing shareholders were not intended to equal the value of their stock. To the contrary, under the 1973 agreement the *corporation's* work in process was entirely segregated from corporate assets and the departing shareholder was compensated for a percentage of the recovery of *his or her own* work in process. Thus, the methods and purposes of payouts to departing shareholders under the 1973 agreement were entirely different from a normal corporate stock valuation, resulting in an artificially deflated stock value.[2] Because the calculation of the amount owed under the 1973 agreement was entirely different from a determination of stock value, the IRS was comparing apples and eggs.

The majority recognizes the error in excluding work in process from stock valuation; indeed, it has held that the tax court erred in doing so. Nevertheless, it endorses the tax court's reliance on a methodology that specifically excludes work in process from the valuation equation. Determining stock value by utilizing the 1973 formula, which specifically excluded work in process, could only yield an inherently skewed result. Thus, the tax court also erred in its valuation methodology as a matter of law by using evidence adduced from the superseded 1973 agreement.

## III

The majority holds that the phrase "claims to any cases or work in process that may otherwise be made" means the expectancy that Cartwright had to be paid a "bonus" in the year of his death. However, this is an argument not made by either party, and the record and the firm's system of shareholder compensation contradicts it.

The undisputed testimony was that shareholders were paid a low fixed salary, but were given additional compensation annually in the form of a bonus. This bonus was dispensed from undistributed profits near the end of each year. The allocation of the bonus was not made by formula; rather, the bonus was distributed on a purely discretionary basis by shareholder vote. Because the bonus was distributed from cash, it could not reflect a disbursement of work in process which, by definition, had not yet been converted to cash. It also could not constitute a distribution based on "cases" because the undisputed evidence was that it was based purely on the exercise of shareholder discretion. Indeed, none of the parties has argued that the annual bonus was intended to be embraced by the shareholder buyout language. None of the historic buyouts upon which the Commissioner relied support such an interpretation. Indeed, contrary to the majority's interpretation, the 1988 amendment specifically provides that "[a]ny amounts owed to Mr. Cartwright for unpaid salary or expenses will be additionally paid or reimbursed to his Estate." Absent any evidence of intent and without supporting contract language, the majority errs in allocating a portion of the life insurance payment to an anticipated bonus.

Even if, *arguendo*, one assumes that the anticipated bonus was to be included in a shareholder buyout, it would still not result in the allocation of the life insurance

2. A simple example illustrates the point. Assume that the present value of the entire firm's work in process is $5 million, that Cartwright was responsible for bringing in 90% of the work in process and that he owned 75% of the corporate stock. Under the 1973 agreement, his estate would be entitled to 25% of 90% of the present value of the firm's work in process, or $1,125,000 attributable to work in process. Under the 1988 amendment, his estate would not receive any separate compensation for the work in process attributable to his efforts, but would receive 75% of the net value of the corporate assets (including all the firm's work in process), or $3,750,000 attributable to the value of work in process. (Of course, in each case, his estate additionally would receive 75% of the net value of the other corporate assets.) The point is, of course, that the differing methodologies yield vastly differing answers and it is improper to compare them.

payment made in this case. The tax court allocated $4,080,256 to "income in respect of the decedent." A review of the historical practices of the law firm, however, belies such a large allocation to a bonus. In the five years preceding his death, Cartwright's bonus ranged from $243,500 to $400,000. For the tax year in which he died, the sum of all compensation—salary and bonus—paid to *all* shareholders was $1,084,881. Thus, it was implausible to assume that Cartwright would have received a $4 million annual bonus. This amount would have defied the historical bonus payments made to Cartwright, and the firm could not have funded it.

In addition, although the firm and the estate have disagreed about nearly everything else, neither of them has suggested that Cartwright's estate is owed more money on account of an expectation of a bonus, or that the annual bonus comprised part of the life insurance payment. To the contrary, an analysis of both the corporate and estate tax returns would indicate that a bonus already has been paid for the year that Cartwright died.[3] For all these reasons, it would be improper to allocate any part of the $5 million payment to an expectancy of an annual bonus, much less four-fifths of the insurance proceeds.

## IV

In sum, the legal effect of the 1988 amendment was to define the $5 million payment as compensation for stock alone. A careful examination of the record supports this conclusion. The tax court erred as a matter of law in concluding otherwise, resulting in a million dollar error. Thus, I would reverse the tax court without remanding for further proceedings. Accordingly, I respectfully dissent.

**3.** As I noted earlier, the undisputed testimony was that the corporate practice was to set relatively low monthly salaries. In fact, one shareholder testified at trial that at a premium price of $10,000 a month "the insurance policy was the highest-paid shareholder in the firm." For many years, Cartwright was paid a salary of approximately $9,000 per month. In tax years 1985 and 1986, he was paid $15,000 per month. In the tax year prior to his death, he was paid $18,000 per month in salary. For the tax year in which he died, Cartwright and his estate were paid $276,000 in addition to the distribution of life insurance proceeds for the tax year in question. Although the record does not reflect what portion of this is bonus and what portion is salary, the sum is roughly proportional to the amount of total compensation paid to Cartwright (salary and bonus) during the prior tax year. It is triple what his salary would have been for the proportional tax year based on previous years' payments. He was never paid as much as $276,000 annually in salary alone, much less in a five month span. Thus, the returns and corporate records support the conclusion that the total compensation paid Cartwright and his estate included both salary and the annual bonus. The majority concludes otherwise. Although I respectfully disagree, in the end the differences in our interpretation may not be significant: it is a matter easily resolved on remand. It was not the subject of debate at trial because neither party contended, as the majority does, that a portion of the life insurance proceeds should be allocated to payment of the annual bonus.