[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 31, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-15013

_____

U.S. Tax Court  No. 540-02

ESTATE OF GEORGE C. BLOUNT, Deceased,
FRED B. AFTERGUT, Executor,

Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
United States Tax Court

_____

(October 31, 2005)

Before BIRCH, CARNES and FAY, Circuit Judges.

BIRCH, Circuit Judge:

Confronting the verisimilitude of American life, death and taxes, this appeal asks us to decide a recurring issue of asset valuation for estate tax purposes and whether a stock-purchase agreement meets the requirements of a tax code exception to the general valuation-at-fair-market-value rule. The estate of Blount was required to sell Bount's shares when he died, and Blount's family business owned an insurance policy to ensure that it would have sufficient liquidity to accomplish the contractual buyout. We AFFIRM the Tax Court's determination that the stock-purchase agreement does not fall within the statutory exception, which would allow the parties to conclusively establish the value of the corporation for taxation purposes at an agreed upon purchase price. Because the Tax Court should not have added the insurance proceeds to the value of the corporation when calculating its fair market value, we REVERSE the court's computation of that value.

## I. BACKGROUND

Blount Construction Company ("BCC") is a closely held Georgia corporation that constructs roads and similar projects for private entities and Georgia municipalities. In 1981, the corporation's only shareholders, William C. Blount and James M. Jennings, and BCC entered into a stock-purchase agreement that required shareholder consent to transfer stock and established that BCC would purchase the stock on the death of the holder at a price agreed upon by the parties

2

or, in the event that there is no agreement, for a purchase price based on the book value of the corporation.

In the early 1990s, BCC purchased insurance policies solely for the purpose of ensuring that the business could continue operations, while fulfilling its commitments to purchase stock under the agreement. These policies would provide roughly $3 million, respectively, for the repurchasing of Jennings and Blount's stock. In 1992, BCC also began an employee stock ownership program ("ESOP") to which the company made annual contributions, either by purchasing stock from Blount and Jennings or by new issuances. Annual valuations were completed by a third party to facilitate the ESOP purchases. For example, as of January 1995, BCC was valued at roughly $7.9 million.[1]

In January 1996, Jennings died owning 46% of BCC's outstanding shares. BCC received about $3 million from the insurance proceeds, and paid a little less than $3 million to Jennings's estate. BCC used the previous year's book value to determine the amount to be paid to Jennings's estate.

In October 1996, Blount was diagnosed with cancer, and his doctor predicted only a few months to live. Concerned that the buyout requirement of the

---

[1] For purposes of this opinion, we round the relevant numbers. We defer to the factual findings of the Tax Court for the establishment of share values to four decimal places and the accurate breakdown of dollars and cents. See Estate of Blount v. Comm'r, 87 T.C.M. 1303 (2004).

1981 stock-purchase agreement would deprive BCC of the liquidity it needed to function, he commissioned several studies regarding the amount of money his estate could receive for his shares and still leave the company in a healthy financial condition. Apparently, Blount was not concerned about his family, because they were wealthy independent of the proceeds from the sale of his BCC stock.

In November 1996, Blount executed an amendment to the 1981 stock-purchase agreement that bound himself and BCC to exchange $4 million for the shares that Blount owned at his death.[2] The 1996 agreement was substantially similar to the subsection in the 1981 agreement regarding the purchase of shares upon the death of the holder. Unlike the 1981 agreement, however, the 1996 agreement did not provide for future price adjustments in accordance with book value, which functionally locked the price at the January 1996 value of BCC. The 1996 agreement also differed from the 1981 agreement by removing the ability of BCC to pay its obligation in installments.

When Blount died in September 1997, he owned 43,080 shares, or roughly 83% of BCC. BCC paid $4 million to the estate of Blount ("Taxpayer") in

---

[2] The Tax Court noted that Blount realized that he was undervaluing his shares by a third. See Estate of Blount, 87 T.C.M. at 1307. The court observed that Blount "was aware when he signed the 1996 agreement setting the price for his shares at $4 million ($92.85/share) that the most recent [Business Valuation Services, Inc.] appraisal had valued BCC at approximately $8 million ($155.32/share), suggesting that [Blount's] shares had a fair market value of approximately $6.7 million." Id.

November of that year "in accordance with the November 11, 1996 Shareholders Agreement."

In 1997, the Taxpayer filed a return declaring $4 million as the value of the shares, and the IRS filed a notice of deficiency claiming that the stock was worth $7,921,975. Implicit in this valuation of Blount's shares is a claim that BCC's fair market value exceeded $9.5 million. The Tax Court held that the 1981 agreement, as modified by the 1996 amendment, was to be disregarded for the purpose of determining the value of the shares. Estate of Blount v. Comm'r, 87 T.C.M. 1303, 1312 (2004). The court also held that the amount of tax should have been calculated by adding the insurance proceeds to the other assets of BCC in order to arrive at the fair market value of the corporation. Id. at 1322.

Three experts testified concerning the value of the stock. First, John Grizzle was offered by the Taxpayer solely on the issue of comparability, that is, whether the method and result of valuing BCC in the 1996 amendment was comparable to the method and results within the industry. He concluded it was, because construction companies that engaged in arm's length negotiations had recently been valued in the industry at four times their adjusted cash flow. Averaging five years of BCC cash flows, Grizzle determined that BCC was worth roughly $4.5 million. Because Blount owned 83% of the company, Grizzle determined that BCC should have paid $3.8 million for Blount's stock. The Tax Court found that

5

no weight could be given to Grizzle's valuation estimate because he only used a cash flow approach and failed to account for BCC's large nonoperating assets. Id. at 1316.

On the issue of the fair market value of BCC, each party offered one expert. The IRS's expert, James Hitchner, concluded that the company was worth $7 million, and the Taxpayer's expert, Gerald Fodor, computed the value at $6 million. Both experts used a blend of asset-based and income-based approaches to determine fair market value, as opposed to Grizzle's cash flow-only approach, which also focused only on the issue of comparability.

Fodor determined that the income-based value of the company was $5.8 million and that the asset-based value was $7.9 million, which he blended at a ratio of 3:1. This resulted in Fodor's $6 million estimate. The Tax Court noted in passing that Fodor did not account for the insurance proceeds, nor did he account for the premium usually associated with a controlling 83% interest in a company.[3] Id. at 1308–09. The Tax Court, nonetheless, adopted Fodor's estimate as a starting point.

---

[3] The Tax Court, however, completely ignored the significant value Blount represented to the corporation. There is no discussion of the effect on BCC of losing Blount's leadership, connections, and general know-how. Because the Tax Court's conclusion is within the range of values suggested by the experts in the case, the result is not clearly erroneous.

Hitchner determined that the income-based value of BCC was in the range of $4.8 to $6.4 million and that the asset-based value ranged from $7.5 to $7 million over two years. Hitchner then weighted the asset-based value over the income-based value in an undisclosed ratio to establish his value for BCC at $7 million. Hitchner, unlike Fodor, determined that the $3 million in proceeds of the life insurance policy should then be added to the base value. Hitchner set the value of BCC at $10 million.

The Tax Court began with Fodor's estimate but concluded that the expert should not have offset the value by the ESOP buyout obligation—for which Fodor made a $750,000 downward adjustment—and that BCC, therefore, was worth $6.75 million. The court found that Hitchner overvalued BCC's cash reserves and that, when this overvaluation was corrected, Hitchner's analysis also would value the company near $6.75 million. Thus, the Tax Court concluded that both experts essentially reached the same base value for the corporation.

Taking this base value of $6.75 million, the Tax Court found that the proper value of the stock was $9.85 million, adding the insurance proceeds of $3.1 million to compute the fair market value of the company Id. at 1322. This meant that the value of Blount's stock for estate tax purposes was $8.2 million, but the Tax Court limited the amount assessed to the value determined by the IRS in its original notice of deficiency, that is, just less than $8 million. Id. As a result of the Tax

7

Court's valuation of the BCC stock, additional taxes of approximately $1.36 million were paid by the Taxpayer to cover the deficiency.

## II. DISCUSSION

We review de novo the Tax Court's rulings on the interpretation and application of the tax code. Roberts v. Comm'r, 329 F.3d 1224, 1227 (11th Cir. 2003) (per curiam). The Tax Court's fact findings are reviewed for clear error. Davenport Recycling Assocs. v. Comm'r, 220 F.3d 1255, 1258 (11th Cir. 2000). In this case, we conclude that the $6.75 million valuation for BCC is not clearly erroneous. However, we find the conclusion of the Tax Court, that the insurance proceeds of $3.1 million should be added to the value of BCC, to be in error.

The federal estate tax applies to the transfer of a citizen's taxable estate. I.R.C. § 2001(a). The value of the taxable estate generally is the fair market value of the decedent's property at the date of death. See I.R.C. §§ 2031(a); 2033. Consequently, the IRS has promulgated regulations to define the calculation of fair market value. See Treas. Reg. § 20.2031-2. Courts have refined the guidance in the regulations into an exception to the general rule for property that is subject to a valid buy-sell agreement. See generally True v. Comm'r, 390 F.3d 1210,1218 (10th Cir. 2004) (collecting cases). The exception has three requirements: (1) the offering price must be fixed and determinable under the agreement; (2) the agreement must be binding on the parties both during life and after death; and (3)

8

the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition. Id.

This exception was codified and further limited in the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388 ("OBRA"). This law applies to all agreements created or substantially modified after 8 October 1990. See OBRA § 11602(e). Under OBRA, the agreement also must (1) have a bona fide business purpose, (2) not permit a wealth transfer to the natural objects of the decedent's bounty, and (3) be comparable to similar arrangements negotiated at arm's length.[4] See I.R.C. § 2703; Treas. Reg. § 25.2703-1(b).

The Tax Court found that the stock-purchase agreement in this case was unilaterally changeable during Blount's lifetime, thereby violating the second prong of the True test and Treas. Reg. § 20.2031-2(h). The court also determined that the terms of the agreement and resulting calculation were not comparable to similar transactions in the industry. Because the Tax Court concluded that the agreement did not appropriately provide the value of the stock for estate tax purposes, the court computed the fair market value of BCC. The Taxpayer

---

[4] Citing the congressional record, courts generally agree that the limitation in I.R.C. § 2703 should be read in conjunction with the court-created rule. See Blount, 87 T.C.M. at 1310 (citing 136 Cong. Rec. S15683 (daily ed. Oct. 18, 1990)). The redundancy of "bona fide business purpose" stands out, but under this construction, OBRA clarifies the third prong of the case law exception: the buy-sell agreement must have a business purpose, not be a testamentary disposition, and must be comparable to other transactions in the industry.

challenges each of the decisions of the Tax Court. First, we address whether the 1981 agreement, as amended by the 1996 modification, created a valuation that was binding on the IRS. Next, we address the Tax Court's fair market value computation for the BCC shares held by Blount at the time of his death.

## A. The 1981 Agreement

We agree with the Tax Court's determination that the 1981 agreement was substantially modified in 1996, thereby making the agreement subject to the tax code changes in 1990 under OBRA. A substantial modification is one "that results in other than a de minimis change to the quality, value, or timing of the rights of any party." Treas. Reg. § 25.2703-1(c)(1). The parties challenge neither the application of Georgia law to the construction of the contract nor the result that the document signed by Blount in 1996 constituted a modification of the 1981 agreement. Therefore, we must determine whether that modification was "substantial" within the terms of the regulation.

The Tax Court concluded, from several perspectives, that the valuation difference in the two agreements was substantial. First, the valuation under the 1996 agreement implicitly limited the value of BCC, at least with regard to Blount's stock, to $4.8 million—which is computed by dividing the amount to be paid, $4 million, by Blount's interest in BCC, 83%. The 1997 appraised value established a book value of $8.5 million, which would have established the value

10

for the buyout without the 1996 agreement. Thus, one of the parties to the agreement, BCC, would have substantially different requirements in the event of performance after the modification versus before it.

The Tax Court pointed to other changes provided by the modification as substantial changes in the rights of the parties to the contract. For example, BCC lost the ability to pay the buyout in installments, a significant change in the seller's rights under the original contract. Further, by setting the price at $4 million dollars, both parties lost the ability to have the price adjust according to the book value or to an annually agreed-upon valuation. For these reasons, we conclude that the 1996 agreement did substantially modify the 1981 agreement making the modified agreement subject to OBRA. Because the 1981 agreement was substantially modified after 8 October 1990, we review the Tax Court's determinations that the agreement failed to meet the exception to the general tax-at-market-value rule under two alternative theories, as discussed in the next two sections.

## 1. **The Binding During Life Requirement**

In order to qualify for the exception to the general rule that stock be valued at its fair market value, the restrictive agreement must be binding during the life of the decedent. See Treas. Reg. § 20.2031-2(h). The 1981 agreement provided that it could only be modified by the "parties thereto." Exh. 14-J at 6. Thus, by the

time the 1996 agreement was consummated, the only remaining parties were BCC and Blount. Blount owned an 83% interest in BCC, was the only person on BCC's board of directors, and was the president of the company. The only parties to the contract who were needed to change it were Blount and BCC, an entity that he completely controlled.

The Taxpayer argues that the ESOP's approval was required and was given by the ESOP's later consent. The ESOP, however, was not a party to the stock-purchase agreement, and its consent was not necessary to modify that contract. The ESOP, as a shareholder of BCC, had to be notified of any transfer or sale of an interest in BCC, but the 1996 agreement did not transfer or sell any interest, so the ESOP's approval was not required. Blount essentially had the unilateral ability to modify the 1981 agreement during his life, and, in fact, he did modify it during his life. The 1981 agreement, therefore, does not meet the exception to the general rule, and the value of the shares in Blount's estate must be determined using a fair-market valuation per I.R.C. § 2703.

### 2. The Comparability Requirement

The Tax Court, reasoning in the alternative, completed the I.R.C. § 2703(b) analysis. It observed that the first two prongs of the test were not at issue. Whether the Taxpayer proved that the agreement was comparable to similar arrangements entered into at arm's length was examined. Similar arrangements are

those that "could have been obtained in a fair bargain among unrelated parties in the same business dealing with each other at arm's length," where a fair bargain is one that "conforms to with the general practice of unrelated parties under negotiated agreements in the same business." Treas. Reg. § 25.2703-1(b)(4)(i).

The Tax Court observed that Grizzle, the Taxpayer's witness on the issue of comparability, established that the basis of his comparison was the sale/purchase prices of similarly situated businesses. The court reviewed Grizzle's testimony for an indication that he considered noneconomic factors that would lead to truly comparable transactions, but found none. The court noted from the outset that Grizzle did not factor anything other than price into his equation of comparability. Estate of Blount, 87 T.C.M. at 1315.

The court concluded that Grizzle's estimate of BCC's fair market value was erroneous because he used only a cash flow-based calculation and failed to account for $1.9 in liquid assets, and, as a result, he valued BCC at $2 million less than other experts on the issue of fair market value. The Tax Court rejected Grizzle's conclusion that industry values were comparable and concluded that the agreement price was not sufficiently close the other experts' determinations for the agreement to satisfy the statutory comparability exception. Based upon the record before us, we find no error with the Tax Court's conclusion. Because the stock-purchase agreement did not establish the value of the stock for tax purposes, the Tax Court

properly concluded that it must establish the fair market value of BCC, on the record before it, in order to discern the value of the Taxpayer's interest.

## B. <u>The Fair Market Value of BCC</u>

To establish the fair market value of BCC, the Tax Court blended the analyses of the experts to arrive at a value of $6.75 million. The IRS and the Taxpayer, albeit alternatively, agree that this is the base value for the assets and liabilities of BCC as of the date of Blount's death. We accept the accuracy of this value as not clearly erroneous. The Tax Court then added the insurance proceeds that BCC would receive on Blount's death to the value of the company, concluding that the value of BCC would have been $9.85 million. In doing so, the Tax Court erred.

In valuing the corporate stock, "consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent that such nonoperating assets have not been taken into account in the determination of net worth." Treas. Reg. § 20.2031-2(f)(2). The limiting phrase, "to the extent that such nonoperating assets have not been taken into account," however, precludes the inclusion of the insurance proceeds in this case. In <u>Cartwright v. Commissioner</u>, the Ninth Circuit approved deducting the insurance proceeds from the value of the organization when they were offset by an obligation to pay those proceeds to the estate in a stock buyout.

14

183 F.3d 1034, 1038 (9th Cir. 1999)[5]; see also Huntsman v. Comm'r, 66 T.C. 861, 875 (1976)[6].

The rationale in Cartwright is persuasive and consistent with common business sense. BCC acquired the insurance policy for the sole purpose of funding its obligation to purchase Blount's shares in accordance with the stock-purchase agreement. Even when a stock-purchase agreement is inoperative for purposes of establishing the value of the company for tax purposes, the agreement remains an enforceable liability against the valued company, if state law fixes such an obligation.[7] Here the law of Georgia required such a purchase.

---

[5] The Ninth Circuit observed that the Tax Court "properly determined that [the] insurance policy would not necessarily affect what a willing buyer would pay for the firm's stock because it was offset dollar-for-dollar by [the] obligation to pay out the entirety of the policy benefit's to [the] estate." Cartwright, 183 F.3d at 1038.

[6] The Tax Court focused on the word "consideration" to make its judgment about including life insurance proceeds: "The Commissioner argues that our interpretation of section 20.2031-2(f), Estate Tax Regs., frustrates the clear intent of Congress to include corporate-owned life insurance in the estate of its sole shareholder. See H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 372, 491; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942) 1942-2 C.B. 504, 677. However, the statements in the legislative history relied upon by the Commissioner indicate only that Congress believed that a sole shareholder was deemed to have the incidents of ownership possessed by his corporation on insurance policies on his life. The regulations now provide that the incidents of ownership held by a corporation are not to be attributed to its shareholder, and no indication is included in the committee reports that Congress intended property owned by a decedent to be includable in his gross estate at other than its fair market value. Consequently, our interpretation of such section does not frustrate a congressional intent. In accordance with section 20.2031-2(f), Estate Tax Regs., we must determine the fair market value of the decedent's stock in the two corporations by applying the customary principles of valuation and by giving 'consideration' to the insurance proceeds." Huntsman, 66 T.C. at 875–76.

[7] Other courts have found—when the restrictive agreement is an attempt to effect a testamentary transfer and avoid the estate tax—that honoring a restrictive element in determining

15

Thus, we conclude that the insurance proceeds are not the kind of ordinary nonoperating asset that should be included in the value of BCC under the treasury regulations. To the extent that the $3.1 million insurance proceeds cover only a portion of the Taxpayer's 83% interest in the $6.75 million company, the insurance proceeds are offset dollar-for-dollar by BCC's obligation to satisfy its contract with the decedent's estate. We conclude that such nonoperating "assets" should not be included in the fair market valuation of a company where, as here, there is an enforceable contractual obligation that offsets such assets. To suggest that a reasonably competent business person, interested in acquiring a company, would ignore a $3 million liability strains credulity and defies any sensible construct of fair market value.

### III. CONCLUSION

The Tax Court properly determined that the 1981 agreement, as amended by the 1996 agreement, had no effect for purposes of determining the value of the BCC shares in Blount's estate and that the fair market value of the corporation was the proper basis for tax assessment. The Tax Court erred when it ignored the

---

fair market value would be improper. See True v. Comm'r, 390 F.3d 1210, 1239–41 (10th Cir. 2004) (listing cases that honor restrictive clauses in determining value and cases that do not honor such restrictive clauses). The IRS urges us to adopt the broadest rule that, when an agreement is ignored for valuation purposes, the agreement plays no role in determining the fair market value. We decline to do so because, as proved by this case, such a rule is overinclusive and represents a manifest departure from common business (i.e., market) sense.

amended agreement's creation of a contractual liability for BCC, which the insurance proceeds were committed to satisfy. We reject the Tax Court's inclusion of the insurance proceeds paid upon the death of the insured shareholder as properly included in the computation of the company's fair market value. We remand for disposition consistent with this opinion.

**AFFIRMED IN PART AND REVERSED IN PART.**