# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3683
_____

Thomas A. Connelly, in his Capacity as Executor of the Estate of Michael P. Connelly, Sr.

*Plaintiff - Appellant*

v.

United States of America, Department of Treasury, Internal Revenue Service

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 14, 2022
Filed: June 2, 2023

_____

Before SMITH, Chief Judge, GRUENDER and STRAS, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Brothers Michael and Thomas Connelly were the sole shareholders of a corporation. The corporation obtained life insurance on each brother so that if one died, the corporation could use the proceeds to redeem his shares. When Michael died, the Internal Revenue Service assessed taxes on his estate, which included his stock interest in the corporation. According to the IRS, the corporation's fair market

value includes the life insurance proceeds intended for the stock redemption. Michael's estate argues otherwise and sued for a tax refund. The district court[1] agreed with the IRS, and so do we.

## I.

Before Michael died, he and Thomas owned Crown C Corporation, a building-materials company in St. Louis. Michael owned 77.18 percent of the 500 shares outstanding (385.9 shares); Thomas owned 22.82 percent (114.1 shares). To provide for a smooth transition of ownership upon either's death, the brothers and Crown together entered into a stock-purchase agreement. If one brother died, the surviving brother had the right to buy his shares. If the surviving brother declined, Crown itself had to redeem the shares. In this way, control of the company would stay within the family. The brothers always intended that Crown, not the surviving brother, would redeem the other's shares.

The stock-purchase agreement provided two mechanisms for determining the price at which Crown would redeem the shares. The principal mechanism required the brothers to execute a new Certificate of Agreed Value at the end of every tax year, which set the price per share by "mutual agreement." If they failed to do so, the brothers were supposed to obtain two or more appraisals of fair market value. The brothers never executed a Certificate of Agreed Value or obtained appraisals as required by the stock-purchase agreement. At any rate, to fund the redemption, Crown purchased $3.5 million of life insurance on each brother.

After Michael died in 2013, Crown received the life insurance proceeds and redeemed his shares for $3 million. The actual redemption transaction was part of a larger, post-death agreement between Thomas and Michael's son, Michael Connelly, Jr., resolving several estate-administration matters. No appraisals were obtained

---

[1]The Honorable Stephen R. Clark, Chief Judge, United States District Court for the Eastern District of Missouri.

pursuant to the stock-purchase agreement. Instead, the Connellys declared that they had "resolved the issue of the sale price of [Michael's] stock in as amicable and expeditious [a] manner as is possible" and that they "have agreed that the value of the stock" was $3 million. That figure effectively valued Crown, based on Michael's 77.18 percent share, at $3.89 million. The rest of the proceeds, about $500,000, went to fund company operations.

Thomas is the executor for Michael's estate. In 2014, the estate filed a tax return reporting that Michael's shares were worth $3 million. To value the shares, Thomas relied solely on the redemption payment, rather than treating the life insurance proceeds as an asset that increased the corporation's value and hence the value of Michael's shares. All told, this resulted in an estate tax of about $300,000, which was paid.

The IRS audited the estate's return. It concluded that the estate had undervalued Michael's shares by simply relying on the $3 million redemption payment instead of determining the fair market value of Crown, which should include the value of the life insurance proceeds. Taking the proceeds into account, Crown was worth $3 million more than the estate had determined—about $6.86 million.[2] So according to the IRS, just before redemption, Michael's estate actually had a 77.18 percent stake in a $6.86 million company—worth about $5.3 million. As a result, the IRS sent a notice of deficiency to the estate for $1 million in additional tax liability. The estate paid the deficiency and sued for a refund. *See* 26 U.S.C. § 7422; 28 U.S.C. § 1346(a)(1).

---

[2]This figure comes from the IRS's own valuation of Michael's interest in Crown plus the $3 million in proceeds used for redemption. The IRS independently determined that Michael's shares were worth $2,982,000 exclusive of the proceeds. At Michael's 77.18 percent share, that represents a company value of $3.86 million—slightly less than the $3.89 million figure arrived at by deeming Michael's shares to be worth $3 million as the redemption transaction effectively did. Because the estate does not challenge this *sans*-proceeds value on appeal, we accept it for our purposes. In any event, it does not affect the issue of how to treat the life insurance proceeds used for stock redemption.

The estate claims that the redemption transaction, made in furtherance of the stock-purchase agreement, determined the value of Crown for estate-tax purposes, so there is no need to conduct a fair-market-value analysis. Alternatively, the estate argues that Crown's fair market value should not include the life insurance proceeds used to redeem Michael's shares because, although the proceeds were an asset, they were immediately offset by a liability—the redemption obligation. In other words, the proceeds added nothing to Crown's value. By contrast, the IRS argues that the stock-purchase agreement should be disregarded and that any calculation of Crown's fair market value must account for the proceeds used for redemption.

The district court granted summary judgment to the IRS. The court first concluded that the stock-purchase agreement did not affect the valuation. The court then determined that a proper valuation of Crown must include the life insurance proceeds used for redemption because they were a significant asset of the company. In doing so, the district court declined to follow *Estate of Blount v. Commissioner*, 428 F.3d 1338 (11th Cir. 2005), relying instead on the tax code, Treasury regulations, and customary valuation principles. The estate appeals.

## II.

A federal tax applies to the transfer of a decedent's estate, which comprises the gross estate minus applicable deductions. 26 U.S.C. §§ 2001, 2051; *Comm'r v. Est. of Hubert*, 520 U.S. 93, 99-100 (1997). A decedent's gross estate includes "the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated" in which he had an interest. §§ 2031(a), 2033. Property includes stocks. *See* 26 C.F.R. §§ 20.2031-1, 20.2031-2. For Michael's gross estate, the only issue on appeal is the value of his Crown shares.

The parties dispute whether Crown's value, and hence the value of Michael's shares, should include the life insurance proceeds used for redemption. If not, then the estate is entitled to a refund. If the proceeds should be included, as the district court determined, then the IRS is correct and summary judgment was proper. With

-4-

this in mind, we review the district court's grant of summary judgment *de novo*. *Westerman v. United States*, 718 F.3d 743, 746 (8th Cir. 2013). In refund actions, "[t]he [IRS's] determination of a tax deficiency is presumptively correct, and the taxpayer bears the burden of proving that the determination is arbitrary or erroneous." *Day v. Comm'r*, 975 F.2d 534, 537 (8th Cir. 1992).

We first consider whether the stock-purchase agreement controls how the company should be valued. Finding that it does not, we then consider whether a fair-market-value analysis of Crown must include the life insurance proceeds used for redemption. It must.

A.

Generally, the value of any property for tax purposes is determined "without regard to any option, agreement, or other right to acquire . . . the property at a price less than the fair market value" or to "any other restriction on the right to sell or use such property." 26 U.S.C. § 2703(a). These sorts of agreements are commonly used by closely held corporations to keep control among a small group of people. *See* 3 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 18:13 (3d ed. Dec. 2022 update). Section 2703(a) tells us to ignore these agreements unless they meet the criteria in subsection (b). Under § 2703(b), to affect valuation, the agreement must (1) be a bona fide business arrangement, (2) not be a device to transfer property to members of the decedent's family for less than full and adequate consideration, and (3) have terms that are comparable to other similar arrangements entered into in arm's length transactions. Here, the estate argues that we should look to the stock-purchase agreement to value Michael's shares because it satisfies these criteria.

But the estate glosses over an important component missing from the stock-purchase agreement: some fixed or determinable price to which we can look when valuing Michael's shares. After all, if § 2703 tells us when we may "regard" agreements to acquire stock "at a price less than the fair market value," we naturally

-5-

would expect those agreements to say *something* about value in a definite or calculable way. *See Est. of Lauder v. Comm'r*, 64 T.C.M. (CCH) 1643, 1656 (1992) ("It is axiomatic that the offering price must be fixed and determinable under the agreement."); *see also Est. of Amlie v. Comm'r*, 91 T.C.M. (CCH) 1017, 1027 (2006) (reviewing the comparability of *price terms* to determine whether the agreement satisfied § 2703(b)(3)). Otherwise, why look to the agreement to value the shares?

Further, the Treasury regulation that clarifies how to value stock subject to a buy-sell agreement refers to the *price* in such agreements and "[t]he effect, if any, that is given to the . . . price in determining the value of the securities for estate tax purposes." 26 C.F.R. § 20.2031-2(h). The regulation also states that "[l]ittle weight will be accorded a price" in an agreement where the decedent was "free to dispose of" the securities at any price during his lifetime. *Id.* Courts thus recognize that an agreement must contain a fixed or determinable price if it is to be considered for valuation purposes. *Est. of Blount v. Comm'r*, 428 F.3d 1338, 1342 (11th Cir. 2005); *Est. of True v. Comm'r*, 390 F.3d 1210, 1218 (10th Cir. 2004); *Est. of Gloeckner v. Comm'r*, 152 F.3d 208, 213 (2d Cir. 1998); *see also St. Louis Cnty. Bank v. United States*, 674 F.2d 1207, 1210 (8th Cir. 1982) (describing when restrictive buy-sell agreements "may *fix the value* of property for estate-tax purposes" (emphasis added)). Congress enacted § 2703 against the backdrop of 26 C.F.R. § 20.2031-2(h), which has remained substantially unchanged, and courts have since interpreted the two in tandem. *See Amlie*, 91 T.C.M. (CCH) at 1024 ("[R]egardless of whether section 2703 applies to a restrictive agreement, the agreement must satisfy the requirements of pre-section-2703 law to control value for Federal estate tax purposes."); *Blount*, 428 F.3d at 1343 n.4 ("[C]ourts generally agree that the limitation in . . . § 2703 should be read in conjunction with the court-created rule."); *True*, 390 F.3d at 1231 (describing § 2703 as "essentially codif[ying] the rules laid out in § 20.2031-2(h)" that had existed before § 2703 was added in 1990).

We need not resolve the precise contours of what counts as a fixed or determinable price because, wherever that line may be, the stock-purchase agreement here falls short given that the brothers and Crown ignored the agreement's

pricing mechanisms. It suffices for our purposes to think of a determinable price as one arrived at by "formula," *see Gloeckner*, 152 F.3d at 213, as by a "fair, objective measure," *see Lauder*, 64 T.C.M. (CCH) at 1659, or "calculation," *see True*, 390 F.3d at 1213.

Here, the stock-purchase agreement fixed no price nor prescribed a formula for arriving at one. It merely laid out two mechanisms by which the brothers might agree on a price. One was the Certificate of Agreed Value, which appears to be nothing more than price by "mutual agreement"—essentially, an agreement to agree. The other was an appraisal process for determining the fair market value of Crown. Although this second mechanism seems to carry more objectivity, there is nothing in the stock-purchase agreement, aside from minor limitations on valuation factors, that fixes or prescribes a formula or measure for determining the price that the appraisers will reach. Instead, the agreement required only that the appointed appraisers "independently determine and submit" their "appraisal[s] of the fair market value of the Company." The brothers were then supposed to average the results or consult a third appraiser as a tiebreaker. None of this was ever done. *See St. Louis Cnty. Bank*, 674 F.2d at 1211 (noting that upon death, the provisions of the stock-purchase agreement were not invoked and that post-death conduct may be relevant to understanding the nature of the agreement). Thus, "under the circumstances of th[is] particular case," neither price mechanism constituted a fixed or determinable price for valuation purposes. *See* 26 C.F.R. § 20.2031-2(h). If anything, the appraisal mechanism calls for a rather ordinary fair-market-value analysis, which § 2031 and § 2073(a) essentially require anyway. Nothing therefore can be gleaned from the stock-purchase agreement.[3]

---

[3]The estate does not argue that the stock-purchase agreement otherwise controls the fair market value of Crown by virtue of its restriction on the transfer of shares (i.e., through non-price-related means). *Compare* § 2703(a)(2), *with* § 2703(a)(1). And even if we understood the estate to make this argument, we find it indistinguishable from the estate's fair-market-value argument that we address in Part II.B below.

Thomas tries to get around this problem by directing us to the price fixed by the redemption transaction—the $3 million that Crown actually paid for Michael's shares. In his view, this is an appropriate valuation because the redemption transaction links back to the stock-purchase agreement and was done pursuant to it. We are not convinced. For one, the $3 million price was chosen *after* Michael's death. *See* 26 U.S.C. § 2031(a) (requiring that value be determined "at the time of [the decedent's] death"); *True*, 390 F.3d at 1218 (noting that "the terms of the agreement [must be] binding throughout life and death"). And second, the $3 million price came not from the mechanisms in the stock-purchase agreement but rather from Thomas and Michael Connelly, Jr.'s "amicable agreement" resolving outstanding estate-administration matters. Thus, Crown's value must be determined "without regard" to the stock-purchase agreement. *See* § 2703(a).

## B.

We now consider the fair market value of Michael's shares. The key question is whether the life insurance proceeds received by Crown and intended for redemption should be taken into account when determining the corporation's value at the time of Michael's death.[4] Two principles guide the analysis. The first deals with valuing property in general, and the second addresses companies whose stock prices cannot be readily determined from an exchange, as is the case with closely held corporations.

---

[4]We focus on this moment in time—after Michael's death but before his shares are redeemed. *See Bright's Est. v. United States*, 658 F.2d 999, 1006 (5th Cir. 1981) (en banc) ("[T]he estate tax is an excise tax on the transfer of property at death and accordingly . . . the valuation is to be made as of the moment of death and is to be measured by the interest that passes, as contrasted with the interest held by the decedent before death or the interest held by the legatee after death."). Regardless of the timing, no one argues that the proceeds were ever in doubt. Crown expected to receive $3.5 million from the policy, most of which would be used to buy Michael's shares.

Generally, the value of property in the gross estate is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 20.2031-1(b); *see also United States v. Cartwright*, 411 U.S. 546, 551 (1973) ("The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves . . . .").

To this end, for closely held corporations, the share value "shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." 26 U.S.C. § 2031(b). Treasury regulations have interpreted this as a "fair market value" analysis. 26 C.F.R. § 20.2031-2(a). The fair market value depends on the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors like "the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; [and] the degree of control of the business represented by the block of stock to be valued." 26 C.F.R. § 20.2031-2(f)(2); *see also Est. of Huntsman v. Comm'r*, 66 T.C. 861, 876 (1976) ("[W]e . . . determine the fair market value of the decedent's stock . . . by applying the customary principles of valuation . . . ."). Setting aside for the moment the life insurance proceeds used to redeem Michael's shares, so far as Crown's operations, revenue streams, and capital are concerned, we know its value—about $3.86 million. *See supra* n.2.

But in valuing a closely held corporation, "consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent such nonoperating assets have not been taken into account in the determination of net worth, prospective earning power and dividend-earning capacity." 26 C.F.R. § 20.2031-2(f)(2). This need to "take[] into account" life insurance proceeds appears again in a nearby regulation, 26 C.F.R. § 20.2042-1(c)(6). That regulation clarifies 26 U.S.C. § 2042, which has to do with life insurance proceeds that go to beneficiaries other than the decedent's estate. Understanding the relationship between § 2031 (defining the gross estate) and

-9-

§ 2042, along with their corresponding regulations, helps further illuminate what it means to "take[] into account" life insurance proceeds.

Section 2042 says that the value of a decedent's gross estate includes life insurance proceeds received directly by the estate as well as proceeds received by other beneficiaries under insurance policies in which the decedent "possessed at his death any of the incidents of ownership." For example, if Michael obtained a life insurance policy for the benefit of Crown, the value of that policy's proceeds would be included in Michael's gross estate. *See* § 2042(2). Yet here, Crown obtained the policy for its own benefit.

Now, there might be a plausible argument that under § 2042 Michael possessed "incidents of ownership" in the life insurance policy through his controlling-shareholder status. If that were the case, then § 2042 would *require* that Michael's gross estate include the proceeds used for his stock redemption. But that is not the case. Treasury regulation § 20.2042-1(c)(6) clarifies that a decedent does not possess the "incidents of ownership" described in § 2042 merely by virtue of being a controlling shareholder in a corporation that owns and benefits from the policy.

Still, although § 2042 does not require that the proceeds be included here, it does not *exclude* them either. We are cautioned to "[s]ee § 20.2031-2(f) for a rule providing that the proceeds of certain life insurance policies shall be considered in determining the value of the decedent's stock." 26 C.F.R. § 20.2042-1(c)(6). Thus, although the life insurance proceeds intended for redemption do not directly augment Michael's gross estate by way of § 2042, they may well do so indirectly through a proper valuation of Crown. Indeed, the $500,000 of proceeds *not* used to redeem shares and which simply went into Crown's coffers undisputedly increased Crown's value according to the principles in § 2031 and 26 C.F.R. § 20.2031-2(f)(2).

We must therefore consider the value of the life insurance proceeds intended for redemption insofar as they have not already been taken into account in Crown's

valuation and in light of the willing buyer/seller test. In this sense, the parties agree that this case presents the same fair-market-value issue as *Estate of Blount v. Commissioner*, 428 F.3d at 1345-46, from the Eleventh Circuit. But they disagree on whether *Blount* was correctly decided. Like here, *Blount* involved a stock-purchase agreement for a closely held corporation. Although the court referenced the requirement in 26 C.F.R. § 20.2031-2(f)(2) that proceeds be "taken into account," it concluded that the life insurance proceeds *had* been accounted for by the redemption obligation, which a willing buyer would consider. 428 F.3d at 1345. In balance-sheet terms, the court viewed the life insurance proceeds as an "asset" directly offset by the "liability" to redeem shares, yielding zero effect on the company's value.[5] The court summarized its conclusion with an appeal to the willing buyer/seller concept: "To suggest that a reasonably competent business person, interested in acquiring a company, would ignore a $3 million liability strains credulity and defies any sensible construct of fair market value." *Id.* at 1346.

Like the estate in *Blount*, Thomas argues that life insurance proceeds do not augment a company's value where they are offset by a redemption liability. In his view, the money is just passing through and a willing buyer and seller would not account for it. The IRS counters that this assumption defies common sense and customary valuation principles, as reflected in Treasury regulations.

The IRS has the better argument. *Blount*'s flaw lies in its premise. An obligation to redeem shares is not a liability in the ordinary business sense. *See* 6A Fletcher Cyclopedia of the Law of Corporations § 2859 (Sept. 2022 update) ("The redemption of stock is a reduction of surplus, not the satisfaction of a liability.").

___

[5]*Blount* cited favorably the Ninth Circuit's decision in *Estate of Cartwright v. Commissioner*, 183 F.3d 1034, 1038 (9th Cir. 1999), which employed similar reasoning. Like the Eleventh Circuit in *Blount*, the Ninth Circuit's analysis was limited—one paragraph citing 26 C.F.R. § 20.2031-2(f)(2) and the tax-court decision in *Estate of Huntsman v. Commissioner*, 66 T.C. at 875, which merely emphasized that life insurance proceeds are to be considered according to § 20.2031-2(f)(2).

Treating it so "distorts the nature of the ownership interest represented by those shares." *See Est. of Blount v. Comm'r*, 87 T.C.M. (CCH) 1303, 1319 (2004), *aff'd in part and rev'd in part*, 428 F.3d at 1338. Consider the willing buyer at the time of Michael's death. To own Crown outright, the buyer must obtain all its shares. At that point, he could then extinguish the stock-purchase agreement or redeem the shares *from himself*. This is just like moving money from one pocket to another. There is no liability to be considered—the buyer controls the life insurance proceeds. A buyer of Crown would therefore pay up to $6.86 million, having "taken into account" the life insurance proceeds, and extinguish or redeem as desired. *See* 26 C.F.R. § 20.2031-2(f)(2). On the flip side, a hypothetical willing seller of Crown holding all 500 shares would not accept only $3.86 million knowing that the company was about to receive $3 million in life insurance proceeds, even if those proceeds were intended to redeem a portion of *the seller's own shares*. To accept $3.86 million would be to ignore, instead of "take[] into account," the anticipated life insurance proceeds. *See id.*

To further see the illogic of the estate's position, consider the resulting windfall to Thomas. If we accept the estate's view and look to Crown's value exclusive of the life insurance proceeds intended for redemption, then upon Michael's death, each share was worth $7,720 before redemption.[6] After redemption, Michael's interest is extinguished, but Thomas still has 114.1 shares giving him full control of Crown's $3.86 million value. Those shares are now worth about $33,800 each.[7] Overnight and without any material change to the company, Thomas's shares would have quadrupled in value.[8] This view of the world

---

[6]$3.86 million divided by 500 shares.

[7]$3.86 million divided by 114.1 shares.

[8]No one has argued that Michael's death and Thomas's subsequent sole ownership of Crown accounts for such an increase. *Cf. Huntsman*, 66 T.C. at 879 ("The decedent was the dominant force in both businesses, and his untimely death obviously reduced the value of the stock in the two corporations.").

contradicts the estate's position that the proceeds were offset dollar-by-dollar by a "liability." A true offset would leave the value of Thomas's shares undisturbed. *See* Cox & Hazen, *supra*, § 21:2 ("When a corporation purchases its own stock, it has depleted its assets by whatever amount of money or property it gave in exchange for the stock. There is, however, an increase in the proportional interest of the nonselling shareholders in the remaining assets of the corporation."). In sum, the brothers' arrangement had nothing to do with corporate liabilities. The proceeds were simply an asset that increased shareholders' equity. A fair market value of Michael's shares must account for that reality.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the IRS.

_____