*PRELIMINARY PRINT*

VOLUME 602 U. S. PART 1

PAGES 257–267

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 6, 2024

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## CONNELLY, AS EXECUTOR OF THE ESTATE OF CONNELLY *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 23–146.   Argued March 27, 2024—Decided June 6, 2024

Michael and Thomas Connelly were the sole shareholders in Crown C Supply, a small building supply corporation.   The brothers entered into an agreement to ensure that Crown would stay in the family if either brother died.   Under that agreement, the surviving brother would have the option to purchase the deceased brother's shares.   If he declined, Crown itself would be required to redeem (*i.e.*, purchase) the shares. To ensure that Crown would have enough money to redeem the shares if required, it obtained $3.5 million in life insurance on each brother. After Michael died, Thomas elected not to purchase Michael's shares, thus triggering Crown's obligation to do so.   Michael's son and Thomas agreed that the value of Michael's shares was $3 million, and Crown paid the same amount to Michael's estate.   As the executor of Michael's estate, Thomas then filed a federal tax return for the estate, which reported the value of Michael's shares as $3 million.   The Internal Revenue Service (IRS) audited the return.   During the audit, Thomas obtained a valuation from an outside accounting firm.   That firm determined that Crown's fair market value at Michael's death was $3.86 million, an amount that excluded the $3 million in insurance proceeds used to redeem Michael's shares on the theory that their value was offset by the redemption obligation.   Because Michael had held a 77.18% ownership interest in Crown, the analyst calculated the value of Michael's shares as approximately $3 million ($3.86 million × 0.7718).   The IRS disagreed.   It insisted that Crown's redemption obligation did not offset the life-insurance proceeds, and accordingly, assessed Crown's total value as $6.86 million ($3.86 million + $3 million).   The IRS then calculated the value of Michael's shares as $5.3 million ($6.86 million × 0.7718). Based on this higher valuation, the IRS determined that the estate owed an additional $889,914 in taxes.   The estate paid the deficiency and Thomas, acting as executor, sued the United States for a refund. The District Court granted summary judgment to the Government. The court held that, to accurately value Michael's shares, the $3 million in life-insurance proceeds must be counted in Crown's valuation.   The Eighth Circuit affirmed.

*Held*: A corporation's contractual obligation to redeem shares is not necessarily a liability that reduces a corporation's value for purposes of the federal estate tax.

When calculating the federal estate tax, the value of a decedent's shares in a closely held corporation must reflect the corporation's fair market value. And, life-insurance proceeds payable to a corporation are an asset that increases the corporation's fair market value. The question here is whether Crown's contractual obligation to redeem Michael's shares at fair market value offsets the value of life-insurance proceeds committed to funding that redemption.

The answer is no. Because a fair-market-value redemption has no effect on any shareholder's economic interest, no hypothetical buyer purchasing Michael's shares would have treated Crown's obligation to redeem Michael's shares at fair market value as a factor that reduced the value of those shares. At the time of Michael's death, Crown was worth $6.86 million—$3 million in life-insurance proceeds earmarked for the redemption plus $3.86 million in other assets and income-generating potential. Anyone purchasing Michael's shares would acquire a 77.18% stake in a company worth $6.86 million, along with Crown's obligation to redeem those shares at fair market value. A buyer would therefore pay up to $5.3 million for Michael's shares ($6.86 million × 0.7718)—*i.e.*, the value the buyer could expect to receive in exchange for Michael's shares when Crown redeemed them at fair market value. Crown's promise to redeem Michael's shares at fair market value did not reduce the value of those shares.

Thomas's efforts to resist this straightforward conclusion fail. He views the relevant inquiry as what a buyer would pay for shares that make up the same percentage of the less-valuable corporation that exists after the redemption. For calculating the estate tax, however, the whole point is to assess how much Michael's shares were worth at the time that he died—before Crown spent $3 million on the redemption payment. See 26 U. S. C. § 2033 (defining the gross estate to "include the value of all property to the extent of the interest therein of the decedent at the time of his death"). A hypothetical buyer would treat the life-insurance proceeds that would be used to redeem Michael's shares as a net asset.

Thomas's argument that the redemption obligation was a liability also cannot be reconciled with the basic mechanics of a stock redemption. He argues that Crown was worth only $3.86 million before the redemption, and thus that Michael's shares were worth approximately $3 million ($3.86 million × 0.7718). But he also argues that Crown was worth $3.86 million *after* Michael's shares were redeemed. See Reply Brief 6. Both cannot be right: A corporation that pays out

Opinion of the Court

$3 million to redeem shares should be worth *less* than before the redemption.

Finally, Thomas asserts that affirming the decision below will make succession planning more difficult for closely held corporations. But the result here is simply a consequence of how the Connelly brothers chose to structure their agreement. Pp. 263–267.

70 F. 4th 412, affirmed.

THOMAS, J., delivered the opinion for a unanimous Court.

*Kannon K. Shanmugam* argued the cause for petitioner. With him on the briefs were *William T. Marks, Yishai Schwartz,* and *Robert L. Devereux.*

*Yaira Dubin* argued the cause for the United States as *amicus curiae* supporting neither party. With her on the brief were *Solicitor General Prelogar, Deputy Assistant Attorney General Hubbert, Deputy Solicitor General Gannon, Charles L. McCloud, Francesca Ugolini, Jennifer M. Rubin,* and *Norah E. Bringer.**

JUSTICE THOMAS delivered the opinion of the Court.

Michael and Thomas Connelly owned a building supply corporation. The brothers entered into an agreement to ensure that the company would stay in the family if either brother died. Under that agreement, the corporation could be required to redeem (*i.e.,* purchase) the deceased brother's shares. To fund the possible share redemption, the corporation obtained life insurance on each brother. After Michael died, a narrow dispute arose over how to value his shares for calculating the estate tax. The central question is whether the corporation's obligation to redeem Michael's shares was a liability that decreased the value of those shares. We conclude that it was not and therefore affirm.

————————

**Jonathan C. Bond, Saul Mezei, Tyler S. Badgley, Elizabeth Gaudio Milito,* and *Patrick J. Moran* filed a brief for the Chamber of Commerce of the United States of America et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for Brant Hellwig, *pro se*; and for Adam Chodorow, *pro se*.

## I

### A

Congress has long imposed a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." 26 U. S. C. § 2001(a).[1] A decedent's "taxable estate" is the value of "all property, real or personal, tangible or intangible," owned by the decedent "at the time of his death," minus applicable deductions. §§ 2031(a), 2051. Imposing the estate tax thus requires calculating the value of the property in the decedent's estate. In general, the lodestar for that assessment is "fair market value," which "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 CFR § 20.2031–1(b) (2021).

A decedent's taxable estate includes his shares in a closely held corporation. 26 U. S. C. § 2031(b). Closely held corporations ordinarily have only a few shareholders (often within the same family) and, unlike public corporations, those shareholders typically participate in the corporation's day-to-day management. 3 J. Cox & T. Hazen, Law of Corporations § 14:1 (3d ed. 2010) (Cox & Hazen). Given this close working relationship, shareholders sometimes enter into an agreement to restrict the transfer of shares to outside investors. 3 *id.*, § 14:9. One such arrangement involves "giving the corporation or the other shareholders the right to purchase the shares of a holder on his death." *Ibid.* A related arrangement, called a share redemption agreement, contractually *requires* a corporation to repurchase a deceased shareholder's shares. Although such an agreement may delineate

---

[1] Not all estates are subject to the estate tax. Because certain credits are allowed against the estate tax, any estate valued below a certain threshold (today, about $13.6 million) is not subject to the tax. See 26 U. S. C. § 2010(c).

how to set a price for the shares, it is ordinarily not dispositive for valuing the decedent's shares for the estate tax. See 26 U. S. C. §2703. As a general rule, the fair market value of the corporation determines the value of the shares, and one must therefore consider "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors," "including proceeds of life insurance policies payable to . . . the company." 26 CFR §20.2031–2(f)(2).

B

Brothers Michael and Thomas Connelly were the sole shareholders in Crown C Supply, a small but successful building supply corporation in St. Louis, Missouri. Michael owned 77.18% of Crown's outstanding shares (385.9 out of 500 shares), and Thomas owned the remaining 22.82% (114.1 shares). The brothers entered into an agreement with Crown to ensure a smooth transition of ownership and keep Crown in the family in the event one of the brothers died. The agreement provided that if either Michael or Thomas died, the surviving brother would have the option to purchase the deceased brother's shares. And, if the surviving brother declined to do so, then Crown itself would be contractually required to redeem the shares. With an exception not relevant here, the agreement specified that the redemption price for each share would be based upon an outside appraisal of Crown's fair market value. App. 12–14. To ensure that Crown would have enough money to redeem the shares if required, Crown obtained $3.5 million in life insurance on each brother.

When Michael died in 2013, Thomas opted not to purchase Michael's shares. As a result, Crown was obligated under the agreement to redeem Michael's shares. Rather than secure an outside appraisal of the company's fair market value (as the agreement contemplated), Michael's son and Thomas agreed in an "amicable and expeditious manner" that the value of Michael's shares was $3 million. *Id.*, at 25–26.

Crown then used $3 million of the life-insurance proceeds to redeem Michael's shares, leaving Thomas as Crown's sole shareholder.

As the executor of Michael's estate, Thomas then filed a federal tax return for the estate. The return reported the value of Michael's shares as $3 million, in accordance with the agreement between Michael's son and Thomas. The Internal Revenue Service (IRS) audited the return. During the audit, Thomas obtained a valuation from an accounting firm. The firm's analyst took as given the holding in *Estate of Blount* v. *Commissioner*, 428 F. 3d 1338 (CA11 2005), which concluded that insurance proceeds should be "deduct[ed] . . . from the value" of a corporation when they are "offset by an obligation to pay those proceeds to the estate in a stock buyout." *Id.*, at 1345. The analyst thus excluded the $3 million in insurance proceeds used to redeem Michael's shares, and determined that Crown's fair market value at Michael's death was $3.86 million. Because Michael held a 77.18% ownership interest, the analyst calculated the value of Michael's shares as approximately $3 million ($3.86 million × 0.7718).

The IRS took a different view, insisting that Crown's redemption obligation did not offset the life-insurance proceeds. The IRS counted the $3 million in life-insurance proceeds excluded by the analyst and assessed Crown's total value as $6.86 million ($3.86 million + $3 million). And, the IRS thus calculated the value of Michael's shares as $5.3 million ($6.86 million × 0.7718). Based on this higher valuation, the IRS determined that the estate owed an additional $889,914 in taxes.

The estate paid the deficiency and Thomas, acting as executor, sued the United States for a refund. As relevant, Thomas argued that the $3 million in life-insurance proceeds used to redeem Michael's shares should not be counted when calculating the value of those shares. The District Court granted summary judgment to the Government, concluding that Michael's estate was not entitled to a refund. *Connelly*

v. *Department of Treasury, IRS*, 2021 WL 4281288, \*17 (ED Mo., Sept. 21, 2021). The court held that the $3 million in life-insurance proceeds must be counted to accurately value Michael's shares. It explained that, under customary valuation principles, Crown's obligation to redeem Michael's shares was not a liability that reduced the corporation's fair market value. *Id.*, at \*14. The court therefore held that Crown's redemption obligation did not offset the life-insurance proceeds. *Id.*, at \*15–\*17. The Court of Appeals affirmed on the same basis. *Connelly* v. *Department of Treasury, IRS*, 70 F. 4th 412 (CA8 2023).

We granted certiorari, 601 U. S. —— (2023), to address whether life-insurance proceeds that will be used to redeem a decedent's shares must be included when calculating the value of those shares for purposes of the federal estate tax. We now affirm.

## II

The dispute in this case is narrow. All agree that, when calculating the federal estate tax, the value of a decedent's shares in a closely held corporation must reflect the corporation's fair market value. And, all agree that life-insurance proceeds payable to a corporation are an asset that increases the corporation's fair market value. The only question is whether Crown's contractual obligation to redeem Michael's shares at fair market value offsets the value of life-insurance proceeds committed to funding that redemption.

Thomas argues that a contractual obligation to redeem shares is a liability that offsets the value of life-insurance proceeds used to fulfill that obligation. Brief for Petitioner 17. He accordingly contends that anyone purchasing "a subset of the corporation's shares would treat the two as canceling each other out." *Ibid.* By contrast, the Government argues that Crown's obligation to pay for Michael's shares did not reduce the value of those shares. It contends that "no real-world buyer or seller would have viewed the re-

demption obligation as an offsetting liability." Brief for United States 15. We agree with the Government.

An obligation to redeem shares at fair market value does not offset the value of life-insurance proceeds set aside for the redemption because a share redemption at fair market value does not affect any shareholder's economic interest. A simple example proves the point. Consider a corporation with one asset—$10 million in cash—and two shareholders, A and B, who own 80 and 20 shares respectively. Each individual share is worth $100,000 ($10 million ÷ 100 shares). So, A's shares are worth $8 million (80 shares × $100,000) and B's shares are worth $2 million (20 shares × $100,000). To redeem B's shares at fair market value, the corporation would thus have to pay B $2 million. After the redemption, A would be the sole shareholder in a corporation worth $8 million and with 80 outstanding shares. A's shares would still be worth $100,000 each ($8 million ÷ 80 shares). Economically, the redemption would have no impact on either shareholder. The value of the shareholders' interests after the redemption—A's 80 shares and B's $2 million in cash— would be equal to the value of their respective interests in the corporation before the redemption. Thus, a corporation's contractual obligation to redeem shares at fair market value does not reduce the value of those shares in and of itself.

Because a fair-market-value redemption has no effect on any shareholder's economic interest, no willing buyer purchasing Michael's shares would have treated Crown's obligation to redeem Michael's shares at fair market value as a factor that reduced the value of those shares. At the time of Michael's death, Crown was worth $6.86 million—$3 million in life-insurance proceeds earmarked for the redemption plus $3.86 million in other assets and income-generating potential. Anyone purchasing Michael's shares would acquire a 77.18% stake in a company worth $6.86 million, along with Crown's obligation to redeem those shares at fair market value. A buyer would therefore pay up to $5.3 million for

Michael's shares ($6.86 million × 0.7718)—*i.e.*, the value the buyer could expect to receive in exchange for Michael's shares when Crown redeemed them at fair market value. We thus conclude that Crown's promise to redeem Michael's shares at fair market value did not reduce the value of those shares.

Thomas resists this straightforward conclusion. He suggests that Crown's redemption obligation "would make it impossible" for a hypothetical buyer seeking to purchase 77.18% of Crown "to capture the full value of the insurance proceeds." Brief for Petitioner 26. That is so, according to Thomas, because the insurance proceeds would leave the company as soon as they arrived to complete the redemption. He argues that the "buyer would thus not consider proceeds that would be used for redemption as net assets." *Ibid.* In other words, Thomas views the relevant inquiry as what a buyer would pay for shares that make up the same percentage of the less-valuable corporation that exists after the redemption. See *Estate of Blount* v. *Commissioner*, 87 TCM 1303 (2004), ¶2004–116 RIA Memo TC, aff'd in part and rev'd in part, 428 F. 3d 1338 (CA11 2005); see also A. Chodorow, Valuing Corporations for Estate Tax Purposes, 3 Hastings Bus. L. J. 1, 25 (2006) ("Any valuation that takes the redemption obligation into account effectively values the corporation on a 'post-redemption' basis, i. e., after the decedent's shares have been redeemed"). But, for calculating the estate tax, the whole point is to assess how much Michael's shares were worth at the time that he died—before Crown spent $3 million on the redemption payment. See 26 U. S. C. §2033 (defining the gross estate to "include the value of all property to the extent of the interest therein of the decedent at the time of his death"); 26 CFR §20.2031–1(b) (the "value of every item of property includible in a decedent's gross estate . . . is *its* fair market value at the time of the decedent's death" (emphasis added)). A hypothetical buyer would thus treat the life-insurance proceeds that would be used to redeem Michael's shares as a net asset.

Moreover, Thomas's argument that the redemption obligation was a liability cannot be reconciled with the basic mechanics of a stock redemption. As the District Court explained, when a shareholder redeems his shares he "is essentially 'cashing out' his share of ownership in the company and its assets." 2021 WL 4281288, *16. That transaction necessarily reduces a corporation's total value. And, because there are fewer outstanding shares after the redemption, the remaining shareholders are left with a larger proportional ownership interest in the less-valuable corporation. Thomas's understanding, however, would turn this ordinary process upside down. In Thomas's view, Crown's redemption of Michael's shares left Thomas with a larger ownership stake in a company with the *same* value as before the redemption. Thomas argues that Crown was worth only $3.86 million before the redemption, and thus that Michael's shares were worth approximately $3 million ($3.86 million × 0.7718). But, he also argues that Crown was worth $3.86 million *after* Michael's shares were redeemed. See Reply Brief 6. That cannot be right: A corporation that pays out $3 million to redeem shares should be worth *less* than before the redemption. See Cox & Hazen § 21:2. Thomas's argument thus cannot be reconciled with an elementary understanding of a stock redemption.

Finally, Thomas asserts that affirming the decision below will make succession planning more difficult for closely held corporations. He reasons that if life-insurance proceeds earmarked for a share redemption are a net asset for estate-tax purposes, then "Crown would have needed an insurance policy worth far more than $3 million in order to redeem Michael's shares at fair market value." Brief for Petitioner 33. True enough, but that is simply a consequence of how the Connelly brothers chose to structure their agreement. There were other options. For example, the brothers could have used a cross-purchase agreement—an arrangement in which shareholders agree to purchase each other's shares at

death and purchase life-insurance policies on each other to fund the agreement. See S. Pratt, Valuing a Business 821 (6th ed. 2022). A cross-purchase agreement would have allowed Thomas to purchase Michael's shares and keep Crown in the family, while avoiding the risk that the insurance proceeds would increase the value of Michael's shares. The proceeds would have gone directly to Thomas—not to Crown. But, every arrangement has its own drawbacks. A cross-purchase agreement would have required each brother to pay the premiums for the insurance policy on the other brother, creating a risk that one of them would be unable to do so. And, it would have had its own tax consequences. By opting to have Crown purchase the life-insurance policies and pay the premiums, the Connelly brothers guaranteed that the policies would remain in force and that the insurance proceeds would be available to fund the redemption. As we have explained, however, this arrangement also meant that Crown would receive the proceeds and thereby increase the value of Michael's shares. Thomas's concerns about the implications of how he and Michael structured their agreement are therefore misplaced.

## III

We hold that Crown's contractual obligation to redeem Michael's shares did not diminish the value of those shares.[2] Because redemption obligations are not necessarily liabilities that reduce a corporation's value for purposes of the federal estate tax, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

---

[2] We do not hold that a redemption obligation can *never* decrease a corporation's value. A redemption obligation could, for instance, require a corporation to liquidate operating assets to pay for the shares, thereby decreasing its future earning capacity. We simply reject Thomas's position that all redemption obligations reduce a corporation's net value. Because that is all this case requires, we decide no more.

————————————————————

Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None

————————————————————